NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

The COLUMBUS PRINTING PRESSMEN & ASSISTANTS' UNION NO. 252, Subordinate to IP & GCU, Respondent.

No. 75–3546.

United States Court of Appeals, Fifth Circuit.

Dec. 13, 1976.

Elliott Moore, Deputy Assoc. Gen. Counsel, Paul J. Spielberg, Supervisor, Frank Morris, Atty., Alan Banov, Atty., John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, N. L. R. B., Washington, D. C., for petitioner.

Frank B. Wolfe, III, Tulsa, Okl., for Page Corp.

John S. McLellan, Kingsport, Tenn., for respondent.

Walter C. Phillips, Director, Region 10, N. L. R. B., Atlanta, Ga., for other interested parties.

Before RIVES,[*] GEWIN and MORGAN, Circuit Judges.

GEWIN, Circuit Judge:

The National Labor Relations Board ("NLRB") petitions for enforcement of its order[1] directing that respondent, The Columbus Printing Pressmen & Assistants' Union No. 252, Subordinate to IP & GCU,[2] ("the union"), bargain collectively with the R. W. Page Corporation ("the company"). The Board found that the union violated section 8(b)(3) of the National Labor Relations Act, as amended, ("the Act"),[3] by insisting to impasse that the company agree to include in the parties' new collective-bargaining agreement a provision requiring the parties to submit disputes over new contract terms to final and binding arbitration. We enforce the Board's order.

I. The Factual and Procedural Background.

Since at least the early 1940's the union and the company have entered into successive collective bargaining agreements, each agreement providing for resolution of disputes over the meaning of the contract by a grievance arbitration procedure and for res-olution of disputes over new contract terms by a "new contract arbitration" procedure.[4] The practice of arbitrating new contract terms has prevailed in the newspaper printing industry for approximately 75 years. The parent organization of respondent has maintained a national arbitration agreement with the American Newspaper Publishers Association since 1905. The local agreement to arbitrate reflects in substance precisely this type of contractual commitment. The last such agreement between the company and union was effective from September 1, 1970, through August 31, 1973. The contract arbitration clause in that agreement was identical with those contained in prior agreements, providing as follows:

Section 2. It is agreed between the Publisher and the Columbus Union that all disputes regarding a new Contract and scale to become effective at the expiration of this Contract, which cannot be settled by negotiation, shall be determined by arbitration as hereinafter provided in Article Sixteen hereof; and this Contract shall remain in force until all disputes are settled by negotiation or arbitration, provided that the party requesting arbitration takes all necessary steps to have the Arbitration Board formed within thirty (30) days from the date of the request of either party in accordance with the provisions hereinafter provided.

In 1970 the union's three-year contract with the company was scheduled to expire

---

[*] Judge Rives was a member of the panel that heard oral argument but due to illness did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d).

[1.] The Board's decision is reported at 219 NLRB No. 54 (1975).

[2.] The term "Subordinate to IP & GCU" is used throughout the record and briefs without clarification.

[3.] 61 Stat. 136, 73 Stat. 519, 88 Stat. 395, 29 U.S.C. §§ 151–68.

[4.] The parties variously style this procedure "interest arbitration" and "new contract arbitration." Believing the latter to be the more descriptive term, we shall use it in this opinion.

There are generally two types or categories of labor arbitration. The more common type is grievance arbitration, which relates to disagreement over the interpretation of the terms of an *existing* contract. The other type is concerned with the arbitration of *new* contract provisions, usually resorted to when the parties are unable to agree on the provisions of a new, renewed or reopened contract. This opinion deals with the latter type. Arbitration resorted to on an ad hoc basis is not involved in our consideration. *See generally* Fleming, Reflections on the Nature of Labor Arbitration, 61 U.Mich.L.Rev. 1245, 1254–58 (1963); Note, Quasi-Legislative Arbitration Agreements, 64 Colum.L.Rev. 109 (1964).

on August 31. The company bargained with the union beyond the expiration date, and on September 29 the only unresolved issue was the retention or deletion of the contract arbitration clause, the company insisting on its deletion. After deadlock, the union submitted the dispute to the arbitration procedure. In March, 1972, Professor Charles O. Gregory issued an award directing that the contract arbitration clause be carried over into the parties' new contract.

On June 27, 1973, the union submitted the draft of a new contract to run from 1973 to 1976. The union proposed inclusion of a new contract arbitration clause. By October 29 three issues remained unresolved: wages, the manning schedule for the "color hump" (the color-producing process), and the contract arbitration clause. The following day the employees rejected the company's last offer. Negotiations continued, with the company offering a further wage increase in exchange for the union's "backing off on [requiring] the excess color man on the hump." The union opposed the contract proposal because it lacked the contract arbitration clause, but submitted it to the employees. A few days later the union reported that the employees would accept the company's latest proposal if the contract arbitration clause were carried forward.

During the succeeding weeks the parties exchanged letters in which they maintained their positions on the clause. The company's last letter contended that the parties had agreed on all other issues, that contract arbitration was not a mandatory subject of bargaining, and that the union was therefore obligated to sign a contract. In February, 1974, when the union wrote to the company seeking to invoke the contract arbitration clause of the 1970–73 contract to obtain inclusion of such a clause in the new contract, the company filed an unfair labor practice charge against it. A majority of the Board (Members Fanning and Jenkins concurring, Chairman Murphy dissenting) agreed with the administrative law judge that contract arbitration is not a mandatory subject of bargaining and that the union

violated section 8(b)(3) of the Act by insisting to impasse that the company agree to its inclusion in a new contract. The Board's order requires the union to cease and desist from the unfair labor practice and to bargain with the company over "wages, hours, and other terms and conditions of employment."

## II. Contract Arbitration as a Mandatory Subject of Bargaining.

■ Under section one of the Act, the policy of the United States is to protect the right of employees to designate their representatives and encourage to collective bargaining between employers and those representatives. 29 U.S.C. § 151. To this end section 8(b)(3) provides that it is an unfair labor practice for a labor organization "to refuse to bargain collectively with an employer." *Id.* § 158(b)(3). Further, section 8(d) provides that

> to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement . . . and the execution of a written contract incorporating any agreement reached if requested by either party . . . . *Id.* § 158(d).

Wages, hours, and other terms and conditions of employment are considered mandatory subjects of collective bargaining, and either party may insist upon inclusion of a clause relating to those subjects. *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 210, 85 S.Ct. 398, 13 L.Ed.2d 233, 238 (1964). By the same token it is unlawful to insist upon the inclusion of a clause relating to matters as to which collective bargaining is not mandatory. *NLRB v. Wooster Division of Borg-Warner Corp.*, 356 U.S. 342, 349, 78 S.Ct. 718, 2 L.Ed.2d 823, 829 (1958); *Philip Carey Manufacturing Co. v. NLRB*, 331 F.2d 720, 726 (6th Cir.), *cert. denied*, 379 U.S. 888, 85 S.Ct. 159, 13 L.Ed.2d 92 (1964). Thus, it is incumbent upon us to determine whether the Board correctly concluded that contract arbitra-

tion is not a mandatory subject of bargaining.

In assessing the Board's conclusion, we must keep in mind the Supreme Court's dictum that "classification of bargaining subjects as 'terms [and] conditions of employment' is a matter concerning which the Board has special expertise." *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 182, 92 S.Ct. 383, 399, 30 L.Ed.2d 341, 359 (1971); *Local Union No. 189, Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 685–86, 85 S.Ct. 1596, 14 L.Ed.2d 640, 646–47 (1965). The Board contends that contract arbitration is a nonmandatory subject because it can have no impact upon the unit employees' working conditions during the term of the contract being negotiated. The union argues, however, that contract arbitration, as a procedure for determining "wages, hours, and other conditions of employment," is so intertwined with working conditions in the contract being negotiated as to render it a mandatory subject. Further, the union contends that employees derive a benefit from such a clause during the term of the contract: they are assured of continuing employment during any dispute that might arise over new contract provisions. Finally, the union insists that a contract arbitration clause is indistinguishable from a cost-of-living escalation clause.

The union's arguments are unpersuasive. First, the analogy to cost-of-living clauses is not apt. Such clauses are in the nature of aleatory contracts; they safeguard employees' interests against certain contingencies which will occur and affect wages, if at all, only during the existence of the contract. In contrast, contract arbitration clauses only affect wages and working conditions during the time periods covered by future contracts. Similarly, there is an "intertwining" between the arbitration clause and terms and conditions of employment only as to the term of a future contract.

The only benefit said to accrue to employees during the term of the contract being negotiated is the "peace of mind" they derive from knowing that disputes over new contract terms will not be resolved by the application of economic pressure. This asserted benefit, however, is too speculative to be considered a term or condition of employment in light of *Allied Chemical & Alkali Workers, supra.* The Board in that case held that the employer had refused to bargain by unilaterally offering retired employees an alternative to the method of payment of group health insurance premiums prescribed by the collective bargaining agreement. The Sixth Circuit refused enforcement of the Board's order, 427 F.2d 936, and the Supreme Court affirmed. *Inter alia*, the Court held that benefits accorded retirees do not "vitally affect" the terms and conditions of employment of active employees, resulting in retirees' benefits being a nonmandatory subject. 404 U.S. at 182, 92 S.Ct. at 399, 30 L.Ed.2d at 359. The Board argued that active employees derived two benefits from representation of retirees' interests: (1) inclusion of retirees in a group health insurance plan enlarged the pool of participants, possibly resulting in lower premiums for active employees; and (2) establishing a practice of representing retirees would insure the future retirement benefits of active employees, as active employees would be likely to continue protecting retirees' benefits in years to come. 404 U.S. at 177–78, 92 S.Ct. at 396–97, 30 L.Ed.2d at 356–57.

The Supreme Court thought neither alleged benefit sufficiently concrete to affect vitally the terms and conditions of employment. As to the first alleged benefit, the Court said:

> The benefits that active workers may reap by including retired employees under the same health insurance contract are speculative and insubstantial at best. As the Board itself acknowledges in its brief, the relationship between the inclusion of retirees and the overall insurance rate is uncertain. Adding individuals increases the group experience and thereby generally tends to lower the rate, but including pensioners, who are likely to have higher medical expenses, may more than offset that effect. 404 U.S. 180, 92 S.Ct. at 398, 30 L.Ed.2d at 358.

Similarly, the Court thought the second asserted benefit too speculative to support an obligation to bargain:

The mitigation of future uncertainty and the facilitation of agreement on active employees' retirement plans, that the Board said would follow from the union's representation of pensioners, are equally problematical. . . . Under the Board's theory, active employees undertake to represent pensioners in order to protect their own retirement benefits, just as if they were bargaining for, say, a cost-of-living escalation clause. . . . By advancing pensioners' interests now, active employees, [however], have no assurance that they will be the beneficiaries of similar representation when they retire. The insurance against future contingencies that they may buy in negotiating benefits for retirees is thus a hazardous and, therefore, improbable investment. 404 U.S. at 180–82, 92 S.Ct. at 399, 30 L.Ed.2d at 358–59.

The Court's observations in *Allied Chemical & Alkali Workers* are equally applicable to the union's "peace of mind" argument here. Numerous new labor contract disputes are resolved prior to the use of economic pressure. Thus, fear of wage losses during a strike is a rather remote fear. In addition, the contingency of a strike is one within the employees' power to prevent, unlike the contingencies, such as inflation and changes in the law, which can affect retirees' benefits. Furthermore, giving up the right to strike may cause anxiety, not peace of mind. As the court noted in *Aikens v. Abel*, 373 F.Supp. 425, 437 (W.D.Pa. 1974),

The emotion-laden term, right to strike, inevitably recalls the bloody and bitter historical struggle for parity that was waged by union members against the steel companies. No one . . . belittles the importance of the right to strike; brave men died to win it. No one discounts their sacrifice.

Indeed, employees may await the expiration of the current contract with anticipation rather than trepidation, as they perceive an opportunity to secure additional benefits through the application of enhanced economic leverage. Further, there is no assurance that employees will be better off economically, even accounting for wage losses due to a strike, under an arbitrated contract than under one reflecting the economic power of each party. Thus, the "peace of mind" benefit supposedly derived during the term of a current contract is too uncertain and "speculative a foundation on which to base an obligation to bargain." 404 U.S. at 182, 92 S.Ct. at 399, 30 L.Ed.2d at 359.

Reading section 8(d) in such a restrictive fashion serves the important purpose of fostering fruitful negotiations by excluding from the mandatory bargaining sphere proposals which have only an indirect or remote impact upon the unit employees. As Mr. Justice Stewart observed in *Fibreboard Paper Products Corp., supra,* 379 U.S. at 220, 85 S.Ct. at 408, 13 L.Ed.2d at 244 (concurring opinion):

It is important to note that the words of the statute are words of limitation. The National Labor Relations Act does not say that the employer and employees are bound to confer upon any subject which interests either of them; the specification of wages, hours, and other terms and conditions of employment defines a limited category of issues subject to compulsory bargaining.

We do not hold that parties to negotiations cannot waive their right to apply economic pressure by adopting a contract arbitration clause. We only hold that such a clause is not a mandatory subject of bargaining, since its effect on terms and conditions of employment during the contract period is at best remote. Therefore the Board correctly determined that a union's insistence to impasse on such a clause constitutes a refusal to bargain under section 8(b)(3) of the Act.

III. Whether Union Insistence on Compliance with a Contract Term can Constitute a Refusal to Bargain.

The union insists that regardless of whether contract arbitration is a mandatory

subject of bargaining, its attempt to invoke an existing contract arbitration procedure cannot constitute a refusal to bargain unfair labor practice. It contends that the Board erred in failing to require the parties to honor their contractual obligation to arbitrate pursuant to the policy announced in *Collyer Insulated Wire,* 192 NLRB No. 150 (1971). In addition, the union argues that the Board decision conflicts with numerous cases holding contract arbitration clauses enforceable under section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185. The Board asserts that its *Collyer* policy is inapplicable to this case and that invoking or seeking court enforcement of an existing contract arbitration clause in order to obtain inclusion of such a clause in a new contract is repugnant to the Act, rendering the existing clause unenforceable.

In *Spielberg Manufacturing Company,* 112 NLRB No. 139 (1955), the Board announced its policy that where arbitration proceedings have been fair and regular and the award is not clearly repugnant to the Act, the Board will defer to the arbitration decision with respect to unfair labor practice charges involving the same subject matter. In *Collyer* the Board extended *Spielberg* to cases where the parties have agreed to an arbitration procedure likely to resolve the issue in a manner compatible with the Act. *See National Radio Co., Inc.,* 198 NLRB No. 1 (1972). That policy of deferral has been seemingly approved by a number of courts,[5] including this one. *See T.I.M.E.–DC, Inc. v. NLRB,* 504 F.2d 294, 302 (5th Cir. 1974); *NLRB v. Brotherhood of Railway, Airline and Steamship Clerks,* 498 F.2d 1105, 1109 (5th Cir. 1974). The *Collyer* policy, however, is exactly that—a policy. Section 10(a) of the Act gives the Board power to prevent persons from engaging in unfair labor practices, unaffected by any means of prevention or adjustment

designed by the parties. *See* 29 U.S.C. § 160(a). Thus, the Board can at any time exercise its jurisdiction over unfair labor practices, regardless of arbitration proceedings. *Carey v. Westinghouse Electric Company,* 375 U.S. 261, 272, 84 S.Ct. 401, 11 L.Ed.2d 320, 328 (1964); *NLRB v. Brotherhood of Railway, Airline and Steamship Clerks, supra.* The Board had a good reason for declining to defer under *Collyer* in this case. *Collyer* comes into play where the dispositive issues are ones of contract interpretation. The employer here has never contested the meaning of the existing contract arbitration clause; rather, it has challenged the enforceability of the clause in the circumstances of this case. The question of whether an attempt to invoke the arbitration procedure itself to obtain a similar clause is a refusal to bargain is a question for the Board's special expertise, not for an arbitrator.

The union also contends that the Board's decision conflicts with cases holding new contract arbitration clauses enforceable in section 301 suits. To appreciate this contention fully, we must review briefly the complicated history of section 301 cases involving this type of clause.[6] The early case of *Boston Printing Pressmen's Union v. Potter Press,* 241 F.2d 787, 789 (1st Cir.), *cert. denied,* 355 U.S. 817, 78 S.Ct. 21, 2 L.Ed.2d 31 (1957), declined to construe section 301 so broadly as to allow enforcement of what the court viewed as quasi-legislative rather than quasi-judicial arbitration. Another early case was one decided by this court, *Austin Mailers Union v. Newspapers, Inc.,* 329 F.2d 312 (5th Cir.), *petition for cert. dismissed,* 377 U.S. 985, 84 S.Ct. 1894, 12 L.Ed.2d 753 (1964), *aff'g* 226 F.Supp. 600 (W.D.Tex.1963). In *Austin Mailers* we affirmed the district court's dismissal of the complaint on the grounds that the prior contract had expired, resulting in no agree-

---

**5.** *See, e. g., Banyard v. NLRB,* 164 U.S.App. D.C. 235, 505 F.2d 342 (1974); *NLRB v. Cincinnati Local 271, Lithographers & Int'l Union,* 495 F.2d 763 (6th Cir. 1974); *Enterprise Publishing Co. v. NLRB,* 493 F.2d 1024 (1st Cir. 1974); *Nabisco, Inc. v. NLRB,* 479 F.2d 770 (2d Cir. 1973).

**6.** An excellent discussion of the historical developments appears in *Chattanooga Mailers Union v. Chattanooga News-Free Press Co.,* 524 F.2d 1305, 1314–15 (6th Cir. 1975).

ment to enforce.[7] In *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), the Court recognized that section 301 "authorizes federal courts to fashion a body of federal law for the . . . specific performance of promises to arbitrate grievances under collective bargaining agreements." 353 U.S. at 450–51, 77 S.Ct. at 915, 1 L.Ed.2d at 977–78. With *Lincoln Mills* and the "Steelworkers Trilogy,"[8] judicial enforcement of agreements to arbitrate grievances has become instrumental in achieving the purposes of the Act.

Since these developments transpired, several courts have had occasion to consider the enforceability of new contract arbitration clauses. The Eighth Circuit has compelled arbitration where one article of the collective bargaining agreement called for specified employer contributions to an insurance plan under a trust agreement "to be agreed upon between the parties" and another article called for arbitration "of any differences which may occur" between the employer and union. *See Builders Association v. Greater Kansas City Laborers District Council*, 326 F.2d 867 (8th Cir.), *cert. denied*, 377 U.S. 917, 84 S.Ct. 1182, 12 L.Ed.2d 186 (1964). Faced with an agreement nearly identical to the one before us, the Fourth Circuit ordered arbitration on a union-proposed "manning provision" which

had proven to be the stumbling block to a new agreement. *See Winston-Salem Printing Pressmen and Assistants' Union v. Piedmont Publishing Co.*, 393 F.2d 221 (4th Cir. 1968). The Sixth Circuit recently has considered similar clauses in two cases. In *Nashville Newspaper Printing Pressmen's Union v. Newspaper Printing Corp.*, 518 F.2d 351 (6th Cir. 1975), that court compelled arbitration of new contract terms without indicating what terms were still unresolved. The case was complicated by the employer's sudden refusal to arbitrate new terms after the company had led the union to believe that it was willing to submit disputed terms to arbitration. The court noted that "[w]e find no need on this record to face the more difficult question as to whether the contract between the parties is binding upon them in perpetuity in the event of a clear-cut notice of termination by one." *Id.* at 352. Later, in *Chattanooga Mailers Union v. Chattanooga News-Free Press*, 524 F.2d 1305 (6th Cir. 1975), the Sixth Circuit held a new contract arbitration clause enforceable, but again the court failed to indicate what contract terms were not resolved by the parties. Thus, it appears that no court has considered the enforceability of such a clause where the only remaining dispute is over inclusion of a contract arbitration clause itself in the new contract.[9]

---

7. We also added in dictum a comment indicating that *Potter Press, supra*, was correctly decided. *Austin Mailers, supra*, at 313. In light of *Textile Workers Union v. Lincoln Mills* and other cases cited *infra* in text, that dicta appears to be incorrect. However, the correctness of our approval in dicta of *Potter Press* in *Austin Mailers* is not relevant to the disposition of the instant case.

8. *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

9. None of the district court opinions that have dealt with contract arbitration clauses provide us with guidance. *Aikens v. Abel*, 373 F.Supp. 425 (W.D.Pa.1974), was a suit by union members challenging the legality of the internal union process used in agreeing to waive the

union's right to strike under a contract arbitration scheme. The validity of such a scheme in general does not dispose of the unique issue we face in the instant case.

Two other cited opinions are not instructive in deciding this case. In *Division No. 892, Amalgamated Ass'n of Street, Electric Railway and Motor Coach Employees v. M. K. & O. Transit Lines, Inc.*, 210 F.Supp. 351, 354 (N.D. Okl.1962), *rev'd on other grounds*, 319 F.2d 488 (10th Cir.), *cert. denied*, 375 U.S. 944, 84 S.Ct. 350, 11 L.Ed.2d 274 (1963), the court ordered arbitration on issues clearly classified as mandatory subjects of bargaining: vacation time, holiday pay, hourly wages, and insurance coverage. In *A. Seltzer & Co., Inc. v. Livingston*, 253 F.Supp. 509 (S.D.N.Y.), *aff'd*, 361 F.2d 218 (2d Cir. 1966), the court refused to grant the company's motion to restrain the union from proceeding with arbitration where the company had signed a recognition form by which it agreed to accept the terms included in collective bargaining agreements between the union

The Board's position is that new contract arbitration clauses are enforceable in section 301 actions insofar as the disputed terms are mandatory subjects of bargaining, leaving the negative implication that such clauses are not enforceable insofar as the disputed terms involve nonmandatory matters. We need not make such a wholesale determination. Rather, we decide only that a contract arbitration clause cannot be enforced in an attempt to obtain such a clause in a new contract. The Board's finding that insistence upon compliance with an existing clause is an unfair labor practice, therefore, does not conflict with the parties' enforceable contract obligations.

There are several important reasons why a new contract arbitration clause should not be enforceable to perpetuate inclusion of the clause in successive bargaining agreements. The contract arbitration system could be self-perpetuating: a party, having once agreed to the provision, may find itself locked into that procedure for as long as the bargaining relationship endures. Exertion of economic force to rid oneself of the clause is foreclosed, for the continued inclusion of the term is for resolution by an outsider. Parties may justly fear that the tendency of arbitrators would be to continue including the clause, for that is exactly what happened in this case. Professor Gregory ordered that the clause be continued in the 1970–73 contract "[because the] contract arbitration provision is an established institution, and has been for a great many years, in agreements between the Pressmen's Union and numerous publishers" and "in view of the fact that these parties have over a long period of time provided for contract arbitration in their agreements. . . ."

This likelihood of a self-perpetuating system would result in a profound change in negotiations under the Act. Sometimes the parties may reach an impasse on a subject even though they have bargained in good faith on it. The impasse does not terminate the bargaining process, for the parties remain bound to negotiate in good faith towards an agreement. *Chambers Manufacturing Corp.*, 124 NLRB 721, 725–726 (1959), enf'd, 278 F.2d 715 (5th Cir. 1960). It does, however, usher in a phase of bargaining wherein "[t]he presence of economic weapons in reserve, and their actual exercise" usually supply the means to break the impasse. *NLRB v. Insurance Agents' International Union*, 361 U.S. 477, 489, 80 S.Ct. 419, 427, 4 L.Ed.2d 454, 464 (1960). *See also Lodge 76, International Association of Machinists and Aerospace Workers v. Wisconsin Employment Relations Commission*, —— U.S. ——, ——, 96 S.Ct. 2548, 2553, 49 L.Ed.2d 396, 404 (1976) (an activity may be unrestricted by any governmental power "because it [is] among the permissible 'economic weapons in reserve . . . actual exercise [of which] on occasion by the parties is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized.'") The resulting shifts in the parties' positions, and the ultimate settlement, ordinarily reflect the balance of economic power between them. This stage of the bargaining process may also contribute significantly to mutual understanding, for the willingness of the parties to inflict and to sustain economic pressure may also make the "real demands of the parties clearer to each other, and perhaps to themselves." *NLRB v. Insurance Agents' International Union, supra*, 361 U.S. at 488, 80 S.Ct. at 426, 4 L.Ed.2d at 463.

Under a scheme of contract arbitration, however, the parties delegate to an outsider the final decision on what terms their next contract will contain. The arbitrator cannot look into a crystal ball and find the precise bargain the parties would have struck had the parties' economic power been exerted against each other. Nonethe-

and a majority of shops under agreement with it, an arbitration panel to resolve disputes over whether terms "are actually in effect in the majority of shops under contract [with the union]." In *Livingston*, therefore, the parties had agreed to all contract terms using an objective standard by which a third party could make a simple determination. That is hardly analogous to this case, where an arbitrator would have to determine whether the term should be included at all, let alone the precise language to be used.

less, the parties may find it mutually advantageous to delegate to a third party the task of determining the terms of a new contract. Promotion of such procedures for the peaceful settlement of disputes is unquestionably an important purpose of the Act. *Carey v. Westinghouse Electric Corp., supra,* 375 U.S. at 271, 84 S.Ct. at 409, 11 L.Ed.2d at 328. However, the perpetuation of contract arbitration clauses in successive contracts may well serve to increase industrial unrest. Under contract arbitration, an outsider imposes contract terms, perhaps, as here, unguided by any agreed-upon standards. In these circumstances, a disappointed party can readily believe that the arbitrator lacked appreciation of its needs or failed to apply appropriate standards, for example, "fair wages." This is particularly the case where the disappointed party was opposed to having a contract arbitration clause in the bargaining agreement, but felt "stuck with it" upon an arbitrator's award that the term be continued. The result is that a party's dissatisfaction with an award may be aggravated by doubts about its legitimacy.

▮ The likelihood that one party will feel aggrieved by a contract arbitration award increases as parties move from contract to contract. The factors which determine the parties' relative strength for strikes and lockouts often changes with the passage of time.[10] An arbitrator may not consider this aspect and may grant one party's contract demands when the other side is convinced that its bargaining opponent could never have obtained them under voluntary collective bargaining. This situation runs counter to a basic premise of the Act—that the cause of industrial peace is best served when "the balance of bargaining advantage [is] set by economic power realities." *NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 1582, 32 L.Ed.2d 61, 73 (1972). The Supreme Court has repeated this premise several times in recent years, and has held, accordingly, that successor employers and purchasers of businesses are not bound by their predecessor's bargaining agreements in some circumstances, *see NLRB v. Burns Internal Security Services, Inc., supra,* and *Howard Johnson Company, Inc. v. Detroit Local Joint Executive Board,* 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); that states may not alter the relative bargaining strengths of the parties by prohibiting the use of peaceful economic weapons in support of bargaining demands, *see Lodge 76, International Association of Machinists and Aerospace Workers v. Wisconsin Employment Relations Commission, supra;* that the Board cannot find that a party, by using economic pressure not unlawful under the Act, commits an unfair labor practice, *see NLRB v. Insurance Agents' International Union, supra;* and that the Board cannot impose its own views of a desirable settlement on the parties, *see H. K. Porter Co., Inc. v. NLRB,* 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970). We think that the same rationale precludes enforcement of a contract arbitration clause in a section 301 suit brought for the purpose of perpetuating inclusion of the clause. Courts cannot bind the parties in perpetuity to forego use of economic weapons in support of bargaining positions.[11] There must

---

10. Indeed, we were informed at oral argument that major technological changes have occurred in the newspaper printing business in the last 10–20 years. In composing rooms, for example, there has been a complete conversion from the old linotype process to a new computerized system, resulting in a dramatic difference in the skills required. Perhaps this technological revolution triggered the employer's resistance to inclusion of a contract arbitration clause in the instant case.

11. Enforcement of the contract arbitration clause does not necessarily mean the clause will be included ad infinitum. The union desir-

ing inclusion of the clause may lose its status as bargaining agent, both parties may agree to delete the clause, or an arbitrator may decide to delete it. These possibilities, however, are merely speculative and indeed in some cases may be quite unlikely. Continuing union status as bargaining representative seems assured for the immediate future in many cases, such as here where the union has been the employees' bargaining agent since at least the early 1940's and, according to the union's counsel, since around 1910. This case also indicates the unlikelihood that parties will agree to delete

remain opportunity for parties to readjust their relationship in response to changed economic circumstances.[12]

We do not hold that contract arbitration clauses are wholly unenforceable. We simply hold that they are not enforceable to perpetuate inclusion of contract arbitration clauses continuously in contract after contract. This holding allows the parties to agree to contract arbitration when they think it is mutually advantageous and entitles them to enforce arbitration over contract terms involving mandatory subjects of bargaining and perhaps others. Contract arbitration itself is not, however, a subject about which arbitration can be enforced. Thus, for example, the parties in this case would have been bound by the contract arbitration clause in the 1970–73 contract to submit disputed issues involving at least "terms and conditions of employment" to arbitration for inclusion in the 1973–76 contract. However, either party could have avoided inclusion of a contract arbitration term in the 1973–76 contract, thus availing itself of the option to readjust the relationship in 1976 to correspond to economic realities. This scheme best reconciles the goals of promoting peaceful resolution of contract disputes and of allowing the parties' relationship and bargaining strengths to reflect changed economic circumstances. The Board was correct in deciding that the union here committed a refusal to bargain unfair labor practice by insisting to impasse that the employer submit to contract arbitration the issue of whether a contract arbitration clause

should be retained or deleted in the 1973–76 collective bargaining agreement.

ORDER ENFORCED.

---

the clause, since one of the parties will usually think it has more to gain from contract arbitration than from exertion of economic pressure. Finally, as noted above, contract arbitrators appear to be reluctant to delete the clause once it has been part of the contract for some time.

12. Further support for this result is derived from the rejection by Congress of compulsory arbitration when it passed both the Wagner and Taft-Hartley Acts. Compulsory arbitration would deprive parties of their right to use economic weapons in the same way that successive contract arbitration provisions would.

Senator Wagner described compulsory arbitration as "so alien to our American traditions of industrial enterprise that it would provoke extreme resentment and constant discord." 74 Cong.Rec. 7573 (1935). Later, Senator Taft, while recognizing the dangers posed by strikes in key industries and the inability of collective bargaining always to prevent them, rejected the use of compulsory arbitration under any circumstances, stating that this procedure "would interfere with the whole process of collective bargaining." 93 Cong.Rec. 3951 (1947).