NATIONAL LABOR RELATIONS BOARD, Petitioner,

and

Lawrence General Hospital, Intervenor,

v.

MASSACHUSETTS NURSES ASSOCIATION, Respondent.

No. 76–1451.

United States Court of Appeals, First Circuit.

June 24, 1977.

Alan Banov, Atty., Washington, D.C., with whom John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Counsel, and Paul J. Spielberg, Atty., Washington, D.C., were on brief, for petitioner.

James T. Grady, Boston, Mass., with whom Grady & McDonald, Boston, Mass., was on brief, for respondent.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and MARKEY *, Chief Judge.

MARKEY, Chief Judge.

The National Labor Relations Board (NLRB), pursuant to § 10(e) of the National Labor Relations Act (Act),[1] seeks enforce-

---

\* Of the Court of Customs and Patent Appeals, sitting by designation.

1. 29 U.S.C. § 160(e):

The Board shall have power to petition any court of appeals of the United States * * within any circuit * * * wherein the unfair labor practice in question occurred * * for the enforcement of such order * * *.

ment of its order[2] directing the Massachusetts Nurses Association (union), *inter alia*, to cease insisting upon the inclusion of an interest arbitration clause[3] in a new collective-bargaining agreement with Lawrence General Hospital (hospital). Following an unfair labor charge filed by the hospital, the NLRB, one member dissenting, found the union to have engaged in unfair labor practice, affecting interstate commerce and violative of § 8(b)(3) of the Act,[4] by insisting to impasse upon the inclusion of a binding arbitration provision in the parties' new agreement. We enforce the order.

## Background

The State Labor Relations Law (state law)[5] of Massachusetts provides for arbitration of grievances or disputes not settled by collective bargaining between health care facilities and the exclusive representatives of their employees.

In 1973, the union and the hospital entered into a collective bargaining agreement containing an interest arbitration clause providing: "[i]n the event the parties are unable to reach a settlement on the terms of a new Agreement, all issues in dispute will be submitted to arbitration in accordance with the rules of the American Arbitration Association." That agreement remained effective until March 1, 1975.

In early 1975, the parties began negotiations for a new agreement. During those negotiations, the hospital proposed that the interest arbitration clause be deleted. The union having refused, the hospital filed an unfair labor charge, alleging that the union had violated § 8(b)(3) of the Act by insisting "to the point of impasse, as a condition of a new collective bargaining agreement, on the continuation of a termination [interest] arbitration provision obligating the parties to arbitrate the terms of future agreements if such terms are not reached by negotiations."

Subsequent to that charge, but prior to the NLRB's order, the parties reached agreement on all terms and conditions of employment except for the interest arbitration provision. A new agreement embodying those terms and conditions was executed by the parties with the following provision:

This Agreement is subject to disposition of the issue concerning impasse resolution. If it is determined that the Association may not under the National Labor Relations Act insist to impasse upon the continuance of the termination arbitration procedure previously contained in collective bargaining agreements between the parties, no such procedure will be provided for herein for purposes of resolving any dispute either in negotiating any changes in Article II, Section 1, or a new Agreement. In the event it is determined that the Association may insist to impasse on such a procedure, then if the parties are unable to reach a settlement on the terms of any changes in Article II, Section 1, or a new Agreement, all issues in dispute will be submitted to arbitration in accordance with the rules of the American Arbitration Association and the instant Agreement

2. Reported at 225 NLRB No. 91 (1976).

3. Occasionally termed "termination" or "contract" arbitration, "interest arbitration" denotes the resolution of disputes over new contract terms through arbitration. Fleming, *Reflections on the Nature of Labor Arbitration*, 61 Mich.L.Rev. 1245 (1963).

4. 29 U.S.C. § 158(b)(3):
    (b) It shall be an unfair labor practice for a labor organization or its agents—
    \* \* \* \* \* \*
    (3) to refuse to bargain collectively with an employer \* \* \*.

5. Mass.Gen.Ann. ch. 150A, § 9A:

(a) In the event of the existence of a grievance or a dispute between a health care facility \* \* \* and an organization designated or selected as the exclusive representative of any nurse or nonprofessional employee of such facility \* \* \* for the purposes of collective bargaining \* \* \* and if such grievance or dispute has not been settled by collective bargaining after reasonable effort so to do by either party, \* \* \* the procedures provided by chapter one hundred and fifty C [arbitration] shall be available, on application of an aggrieved party, to determine the controversy \* \* \*.

will remain in effect pending the outcome of such arbitration.

The NLRB, one member dissenting, following *Columbia Printing Pressmen & Assistants' Union No. 252 (The R.W. Page Corp.)*, 219 NLRB No. 268 (1975), *enforced* 543 F.2d 1161 (5th Cir. 1976), found the interest arbitration clause a nonmandatory subject of bargaining and determined that neither Massachusetts state law nor the Health Care Amendments [6] of the Act warranted the carving out of an exception for the health care industry.

The union contends: (1) that interest arbitration is a mandatory subject of bargaining under the Act, hence insistence upon such a clause in the new agreement is not an unfair labor practice; (2) that, if interest arbitration with respect to industry in general is not a mandatory subject of bargaining, the health care industry is distinct and must be treated separately; and, (3) that state law and the Health Care Amendments to the Act require separate treatment for the health care industry.

### OPINION

■ Section 8(d) of the Act states that "to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment * * *." 29 U.S.C. § 158(d). The duty to bargain collectively is thus limited to the subjects of "wages, hours, and other terms and conditions of employment." Within the area of those subjects "neither party is legally obligated to yield." *NLRB v. Wooster Division of Borg-Warner Corp.*, 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823 (1958). Outside the area of those subjects, however, the parties are free to bargain or not to bargain as they choose. *Id.* The words of the statute are limiting, and define "a limited category of issues subject to compulsory bargaining." *Fibreboard Pa-*

*per Products Corp. v. NLRB*, 379 U.S. 203, 220, 85 S.Ct. 398, 408, 13 L.Ed.2d 233 (1964) (Stewart, J., concurring).

■ The union contends that the test of whether a proposal is a mandatory subject of bargaining is whether it broadly affects the "relationship" "between the employer and [the] employees." *Allied Chemical and Alkali Workers of America, Local No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 178, 92 S.Ct. 383, 397, 30 L.Ed.2d 341 (1971). Such a test, however, is overly broad and, without more, would bind employers and employees to bargain on almost any subject which interested them. Such construction would not effectuate the intent of Congress to limit the areas subject to compulsory bargaining. *Fibreboard, supra*, 379 U.S. at 220, 85 S.Ct. 398. (Stewart, J., concurring). Nor was such a broad test either contemplated or mandated by the Court in *Allied Chemical*, where the question was whether retired employee's insurance benefits were a mandatory subject of bargaining as "terms and conditions of employment." In resolving that question, the Court had to consider whether retirees were "employees" within the statute, and, if they were not, whether retiree benefits so affected the terms and conditions of employment of active employees as to make such benefits a mandatory subject of bargaining. The Court answered both questions in the negative, pointing out that § 8(d) establishes "a limitation against which proposed topics must be measured." 404 U.S. at 178, 92 S.Ct. at 397. That limitation, the Court said, "includes only issues that settle an aspect of the relationship between the employer and employees." *Id.* The remainder of the Court's opinion makes it clear that the reference to an employment relationship occurred in the context of whether retirees were in fact employees and whether benefits to nonemployees affected the employment terms and conditions of employees. The Court did not hold, as the union would have us effectively do, that

---

**6.** Act of July 26, 1974, Pub.L. No. 93–360, 88 Stat. 395 (codified in scattered sections of 29 U.S.C.).

*any* issue that settles an aspect of the "relationship" between the employer and employee should be considered a mandatory subject of bargaining. An agreement on interest arbitration settles nothing of substance immediately; it lacks the required direct, significant, relationship to wages, hours or terms or conditions of employment. A mere remote or incidental relationship is insufficient. *Seattle First National Bank v. NLRB*, 444 F.2d 30, 33 (9th Cir. 1971). We agree with the conclusion of the Fifth and Fourth Circuits that an interest arbitration provision bears only a remote relation, if any, to wages, hours or other terms or conditions of employment and, accordingly, is not a mandatory subject of bargaining. *NLRB v. Columbus Printing Pressmen & Assistants' Union No. 252, supra*, 543 F.2d at 1164–66; *NLRB v. Greensboro Printing Pressman & Assistants' Union No. 319*, 549 F.2d 308 (4 Cir. 1977).[7]

Our conclusion is unaffected by the union's attempted analogy between interest arbitration and management function clauses. Contrary to the position taken by the union, management function clauses, the subject of *NLRB v. American National Insurance Co.*, 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952), bear little analogy to interest arbitration provisions. Management function clauses are of the type which may grant unilateral, non-arbitrable power to one of the contracting parties to alter and directly affect conditions of employment during the term of the contract. Indeed, the clause proposed by American in *American National* reads:

The right to select and hire, to promote to a better position, to discharge, demote or discipline for cause, and to maintain discipline and efficiency of employees and to determine the schedules of work is recognized by both union and company as the proper responsibility and prerogative of management to be held and exercised by the company, and while it is agreed that an employee feeling himself to have been aggrieved by any decision of the company in respect to such matters, or the union in his behalf, shall have the right to have such decision reviewed by top management officials of the company under the grievance machinery hereinafter set forth, it is further agreed that the final decision of the company made by such top management officials shall not be further reviewable by arbitration. [343 U.S. at 398, 72 S.Ct. at 826.]

■ Nor can we agree that the nature of the health care industry warrants a judicially created exception. Interest arbitration has no more direct impact on terms and conditions of employment in the health care industry than it does on such terms and conditions of employment in any other industry. We agree with the union that Congress, in enacting the Health Care Amendments, evidenced a clear understanding of the unique responsibilities and problems attendant upon the health care industry and we fully recognize the need to maintain uninterrupted health care services for the benefit of the sick and injured. The legislative history of the Health Care Amendments clearly indicates, however, that Congress sought to avoid strikes or work stoppages in the health care field by providing for notice and the use of conciliation machinery, 29 U.S.C. § 183, rather than by establishing interest arbitration as a mandatory subject of collective bargaining. Moreover, to add to the list of subjects which the parties may insist on to impasse would, in our view, tend more to frustrate than to further the congressional objective of avoiding impasse situations in the health care field.

7. When an interest arbitration clause results in an arbitrator's determination of wages, hours, and other terms or conditions of employment appearing in the new contract, it bypasses the normal collective bargaining route so central to the National Labor Relations Act with respect to those matters. Such a clause is legal, and may indeed be desirable in some industries. It is not, however, the sort of clause which Congress envisioned as falling among those a party may insist upon negotiating over the objections of an adversary. We find no congressional intent to permit a combatant, willing to give up the fight on some proper issues of collective bargaining, to insist that his adversary do battle over making the surrender mutual.

That Massachusetts has made arbitration procedures available to negotiating parties in the health care industry in Massachusetts cannot be controlling upon the interpretation or application of federal law as spelled out in the Act. We do not hold that the Act forbids the voluntary adoption of interest arbitration by the parties. Negotiating parties remain perfectly free to include interest arbitration clauses, as envisaged in the state law, if they so desire. Neither party may, however, under the Act, insist to impasse on the inclusion of an interest arbitration clause.

Accordingly, the order is enforced.