**CUMBERLAND TYPOGRAPHICAL UNION NO. 244, Plaintiff,**

v.

**The TIMES AND ALLEGANIAN COMPANY, Defendant.**

**Civ. A. No. HAR–89–3199.**

United States District Court, D. Maryland.

Aug. 28, 1990.

Norman M. Gleichman, Washington, D.C., Richard Rosenblatt, Castle Rock, Colo., for plaintiff.

Richard F. Shaw, Jones, Day, Reavis & Pogue, Washington, D.C., James A. Rydzel, James O. Perrin, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for defendant.

## MEMORANDUM OPINION

HARGROVE, District Judge.

Presently before this Court are cross motions for Summary Judgment filed by the parties in this case. The issues have been fully briefed and material facts stipulated. No hearing is deemed necessary. Local Rule 105.6 (D.Md.).

## FACTS

Plaintiff Cumberland Typographical Union No. 244 ("Union") is the exclusive representative of composing room employees ("employees") working for Defendant Times and Alleganian Company ("Company"). The Company is a corporation with its principal place of business in Cumberland, Maryland. It publishes a daily newspaper, The Cumberland–Times News. The Union is affiliated with the Printing, Publishing and Media Workers Sector of the Communications Workers of America.

The parties have entered into a number of successive collective bargaining agreements over the years. These agreements have included a grievance/arbitration procedure providing for final and binding arbitration.[1] In 1976, the parties negotiated a lifetime job guarantee for the employees.

---

1. The grievance/arbitration agreement is as follows:

   A standing committee of two representatives by the Employer and like committee of two representatives appointed by the Union, shall be maintained; and in case of a vacancy, absence or refusal of either of such representatives to act, another shall be appointed in his place. To this Joint Standing Committee shall be referred all disputes which may arise as to the construction to be placed upon any clause of the agreement, except as provided otherwise herein, or alleged violations thereof, which can not be settled otherwise, and such

During the 1970s, such negotiated guarantees became common in contracts between newspapers and typographical unions.[2] The agreement has been included in successive collective bargaining agreements and still remains in effect.[3]

In October, 1987, with the previous agreement set to expire at the end of the month, the parties began negotiating a new collective bargaining agreement. The parties reached agreement on all terms of a new contract except for wages, including retention of the lifetime job security agreement and the arbitration procedure.

While negotiating a new contract, the parties continued to abide by all terms and conditions of the expired contract, including the old wage scale of $434.50 for a 35-hour work week.[4] The Company proposed cutting the weekly wage to $289.50 while increasing hours to a 40-hour week. In October, 1988, the Company increased its wage proposal to $302.00 for a 40-hour work week. On February 15, 1989, the Company made a "final offer" to the Union. The offer incorporated all tentative agreed upon provisions along with the $302.00 wage and 40-hour work week proposal. The Union rejected the offer, claiming that these proposals violated the lifetime job guarantee provision. Less than a month later, the Company dropped the weekly hours of its proposal from 40- to 35-hours per week. The $302.00 dollar figure was retained. The Union again rejected the offer.

In a letter to Union president Richard Goebel dated June 2, 1989, Don Miller, Publisher of the Cumberland Times–News, stated that the parties were at an impasse. He informed the Union that on June 18, 1989, the Company would unilaterally impose its final offer, including the $302.00 wage.

The Union answered this letter on June 8, 1989. It disputed that the parties were

Joint Standing Committee shall meet when any question of difference shall have been referred to it for decision by the executive officers of either party to this agreement. Should the Joint Standing Committee be unable to agree then it shall refer the matter to a board of arbitration, the representatives of each party to this agreement to appoint two arbiters, and the four to agree upon a fifth. The decision of this board shall be final and binding upon both parties: Provided: The local union laws not affecting wages, hours, or working conditions and the General Laws of the International Typographical Union shall not be subject to arbitration. All decisions of the Joint Standing Committee shall be given in writing to all parties concerned.

2. In 1987, an arbitrator estimated that locals in 111 cities had negotiated such agreements. *In re Tribune Review Publishing Co.*, No. 55–300–0105–86 (April 27, 1987) (Irwin J. Dean, Arb.), enf'd, *Tribune Review Publishing Co. v. Greensburg-Jeannette Typographical Union, Local # 668*, No. 87–1072, 1988 WL 216168 (W.D.Pa. June 8, 1988).

3. The lifetime job guarantee provision reads as follows:

The Employer agrees that all employees (journeymen and apprentices), covered by this agreement with a priority date of November 1, 1976 or earlier, whose names appear on the attached priority list will be retained on situations for the remainder of their working life unless vacating same through retirement, resignation, permanent disability, death or discharge for cause. Provided, however, in the event of permanent suspension of the Employer's operation such employment guarantee will thereupon cease, and provided further, in case of a strike, lockout, Act of God, or other situation over which Employer has no control, results in a period of temporary suspension of the Employer's operations, the job guarantee will be suspended for such period of temporary suspension of operation only.

The terms of this Article shall continue in force through succeeding agreements unless changed by mutual agreement between the parties.

Because of and in consideration of the unique job guarantee set forth in this agreement, it is specifically agreed that the Company shall have the right to take full advantage of all automation and technology development which, in the opinion of the Company, would improve productivity, efficiency, and/or economy, provided, however, the above individual lifetime job guarantee will not be affected by the introduction of any new equipment or procedures.

There will be no reproduction.

In the event of a severe economic downturn, the parties to this agreement will meet for the purpose of determining what, if any, action shall be taken as it relates to this agreement.

4. This salary, which had been negotiated in a 1984 agreement, reflects an increase in wages that the employees had enjoyed since 1978 when they were paid $262.00 per week.

at a genuine impasse. The Union further stated its belief that the wage proposal violated the lifetime job agreement.

On June 18, 1989, the Company implemented its wage proposal, unilaterally cutting the employees' wages to $302.00 for a 35–hour work week. Also implemented were all other previously agreed upon terms, including the lifetime job guarantee and the grievance/arbitration provision. The Company notified the Union of its action by letter dated June 19, 1989.

On June 28, 1989, the Union filed a grievance seeking to arbitrate the wage cut, alleging that it violated the lifetime job guarantee. The Joint Standing Committee met on July 11, 1989, to hear the Union's grievance. The dispute was not resolved. The Union requested that the matter go to arbitration under the terms for arbitration in the contract. The Company refused to arbitrate, claiming the wage reduction did not violate the contract and that it had no duty to send wage issues to arbitration.

On November 20, 1989, the Union filed a two-count complaint with this Court pursuant to Section 301 of the Labor–Management Relations Act of 1947, 29 U.S.C. § 185. Count One asks that this Court compel the Company to arbitrate the dispute with the Union and stay these proceedings to allow the Plaintiff to return to this Court should the arbitration panel decide that the issue is not arbitrable or if issues remain unresolved following arbitration. Count Two, stated only in the alternative, asks that this Court rescind the wage reduction imposed by the Company and require the Company to "honor and abide by all terms of the job security provision." Complaint, Count Two, paragraph one. The Union also seeks $1,000,000.00 in damages under Count Two for the loss of job rights and wages.

Plaintiff filed for a motion for summary judgment as to Count One of the complaint, asserting that the reduced wage instituted by the Company arguably violates the lifetime job guarantee. It seeks an order compelling the Company to arbitrate the dispute. Defendant countered with its own motion for summary judgment, maintaining that the Union is seeking to force arbitration of wages, a "new contract" issue not covered by the arbitration provision of the contract and generally not sent to arbitration for public policy reasons.

There is no dispute that the lifetime job guarantee was in full effect even though there was no active collective bargaining agreement during the period in which negotiations between the parties took place. The parties also agree that the arbitration clause contained in the prior contracts is binding in this dispute.

*Discussion*

■ Arbitration is a matter of contract. Therefore, "[u]nless the parties clearly and unmistakenly provide otherwise," arbitrability is to be decided by the Court. *AT & T Technologies v. Communications Workers of America*, 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) (citations omitted). In deciding whether a grievance should be settled by arbitration, the Court is specifically proscribed from ruling upon the merits of the underlying grievance, "even if it appears to the court to be frivolous....

'The courts ... have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious.'"

*Id.* at 649–650, 106 S.Ct. at 1419, *quoting United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960) (footnote omitted).

■ When there is an arbitration clause in a contract, "there is a presumption of arbitrability....

'An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'"

*Id., quoting United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574,

582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960). However, " 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " *Id.* at 648, 106 S.Ct. at 1418, *quoting Warrior & Gulf Navigation*, 363 U.S. at 582, 80 S.Ct. at 1353; *American Manufacturing Co.*, 363 U.S. at 570–71, 80 S.Ct. at 1364–65 (Brennan, J., concurring).

It is clear that the lifetime job guarantee is a vested right of the employees. It is a part of the collective bargaining agreement. Under the arbitration clause contained in the contract, any dispute arising out of the job guarantee is unquestionably subject to arbitration.

■ Wage provisions are future interests. As such, they generally are not prone to arbitration outside an express agreement between the parties. *See Montgomery Mailers Union No. 127 v. Advertiser Co.*, 827 F.2d 709 (11th Cir.1987); *United Autoworkers v. Exide Corp.*, 688 F.Supp. 174, 183 (E.D.Pa.), *aff'd*, 857 F.2d 1464 (3d Cir.1988); *Couch v. Prescolite Manufacturing Corp.*, 191 F.Supp. 737 (W.D.Ark.1961). Nowhere does it appear that the parties contemplated employing arbitration to settle an impasse in wage negotiations.[5]

■ The wage provision imposed by the Company arguably has a direct impact upon the arbitrable lifetime job guarantee. Thus, we are presented with a peculiar circumstance in which one party seeks to force arbitration of a seemingly unarbitrable issue due to its potential impact upon an admittedly arbitrable vested contractual provision.[6] Due to the overwhelming presumption of arbitrability, and the safeguards that the arbitration system and judicial review confer upon both parties, this Court will compel the parties to take this issue to binding arbitration pursuant to the provisions of the collective bargaining agreement.

■ The Union asserts that the wage cut imposed by the Company violates the implicit conditions of the lifetime job provision by making it illusionary. This Court is specifically prohibited from ruling on the merits of this contention. *See AT&T Technologies, supra.* Instead, the Court is constrained to ruling upon whether the Union's theory is colorable in light of the contractual provisions. *Id.* Implicit in the agreement, claims the Union, are guarantees of minimum working conditions, hours, and wages. This is the only rational way that the job guarantee can maintain its intended meaning and not become a hollow agreement subject to the whims of the Company. While the Company is correct in stating that it has never explicitly agreed to submit wage provisions to arbitration, when the Company accepted the job guarantee, it necessarily subjected future actions which could impact upon the provision to binding arbitration.

This Court finds that it can be rationally argued that the unilateral wage reduction implemented by the Company violates the guaranteed conditions of the job guarantee. Therefore, under the contract, the new wage implemented by the Company must be sent to arbitration for the limited purpose of determining whether it violates of the lifetime guarantee. *See Warrior & Gulf Navigation*, 363 U.S. at 582–83, 80 S.Ct. at 1352–53; *Controlled Sanitation Corp. v. District 128, International Association of Machinists and Aerospace Workers*, 524 F.2d 1324, 1328 (3rd Cir. 1975), *cert. denied*, 424 U.S. 915, 96 S.Ct. 1114, 47 L.Ed.2d 319 (1976) ("presumption in favor of arbitrability ... should only be dispelled when the agreement explicitly exempts certain conduct ... or when the terms of the agreement, read as a whole, clearly envision nonarbitrability").

The Court also notes that the Company is protected from overt activism on the part

---

5. Even where the parties have agreed to submit *future wages to arbitration, some courts have* struck down the provision as contrary to public policy. *See NLRB v. Columbus Printing Pressmen & Assistants, Union No. 252,* 543 F.2d 1161 (5th Cir.1976).

6. This appears to be a case of first-impression for the federal courts. In 1987, a newspaper and typographical union submitted the effects of a pay reduction upon a lifetime job guarantee to arbitration. However, the issue of arbitrability was never raised. *See Tribune Review Publishing Co., supra,* note 2.

of the arbitration panel by the arbitration process itself. Requiring the Company to submit the wage cut to arbitration to determine its impact upon the job guarantee will not take the wage issue out of the domain of collective bargaining. The arbitration panel's powers in this matter are very limited. It may only rule that the wage cut made by the Company violates the guarantee. It may not offer "[its] own brand of economic justice." *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). Therefore, the panel is prohibited from setting or even suggesting an acceptable wage. Thus, if the panel strikes down the wage, the parties will continue the negotiating process until a new level of pay is reached.[7]

The Company points out that the weekly wage rate for the employees has gone up from $262.00 when the guarantee went into effect to $434.50 before the Company sought to cut the salary to $302.00. Since the new wage is higher than the pay when the job provision went into force, the Company maintains that the Union is precluded from arguing that the new wage undermines the guarantee. The Company's contention goes to the heart of the merits of Plaintiff's grievance. Accordingly, this Court cannot consider the Company's argument. *AT&T Technologies*, 475 U.S. at 649–50, 106 S.Ct. at 1418–19. The Company can raise this evidence with the arbitration panel.

The Company further contends that an order of arbitration would be contrary to public policy, stating that Courts have consistently held that an arbitrator cannot decide to perpetuate a "new contract" arbitration provision, citing *NLRB v. Columbus Printing Pressmen & Assistants, Union No. 252*, 543 F.2d 1161, 1169–70 (5th Cir.1976) and *Bally Manufacturing Corp. v. International Brotherhood of Electrical Workers, Local Union No. 713*, 605 F.Supp. 110 (N.D.Ill.1985). Neither of these cases involved the situation presented in the case at bar where the "new con-

tract" provision had a direct and substantial effect upon a vested arbitrable right. Furthermore, as stated above, the Company is being compelled to arbitrate the effect of the wage provision upon the job guarantee. The wage provisions of the contract is not strictly a matter of the arbitration. The arbitrator is prohibited from substituting his judgment by setting a new wage. Thus, public policy is not violated by compelling the parties to go to arbitration. To the contrary, sending this matter to arbitration in order to preserve a negotiated provision in a labor contract is strictly in the public interest. This Court's ruling will allow for the "continued reliance on arbitration, rather than strikes and lockouts, as the preferred method of resolving disputes arising [out of] a collective-bargaining agreement" in order to promote "the longstanding federal policy of promoting industrial harmony through the use of collective bargaining agreements." *AT&T Technologies*, 475 U.S. at 648, 651, 106 S.Ct. at 1418, 1419.

Accordingly, the Company is ordered to submit this dispute to binding arbitration under the terms of the collective bargaining agreement. This action will be stayed pending the outcome of the arbitration. 9 U.S.C. § 3.

Count Two of Plaintiff's complaint seeks only alternative relief to that asked for in Count One "[should] the Court concludes that the dispute between the parties is not arbitrable." Since the Court by this opinion has granted the relief sought by the Union in Count One of its complaint, Count Two of Plaintiff's complaint is dismissed.

It will be so ordered.

### ORDER

For the reasons set forth in the accompanying Memorandum Opinion, IT IS this 28th day of August, 1990, by the United States District Court for the District of Maryland hereby ORDERED:

1. That Plaintiff Cumberland Typographical Union No. 244's Motion for Sum-

---

7. If the parties are forced to go back to the bargaining table and the Company again imposes a new wage without an agreement being reached, the Union theoretically could file an-

other grievance and ask for arbitration. A new arbitration panel would then review the new wage proposal.

**116**

mary Judgment on Count One of its Complaint BE, and the same hereby IS, GRANTED;

2. That the parties SUBMIT the issue of whether the wage imposed by Defendant The Times and Alleganian Company violates the contractual lifetime job guarantee to binding arbitration under the procedures set forth in the collective bargaining agreement;

3. That Count Two of Plaintiff's Complaint BE, and the same hereby IS, DISMISSED without prejudice;

4. That Defendant The Times and Alleganian Company's Motion for Summary Judgment BE, and the same hereby IS, DENIED;

5. That the Clerk of the Court STAY this case.