**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PENN CORK & CLOSURES, INC., Respondent,**

**District Lodge No. 15 of the International Association of Machinists, AFL–CIO, Intervenor.**

**No. 280, Docket 30820.**

United States Court of Appeals Second Circuit.

Argued Jan. 24, 1967.

Decided April 10, 1967.

Stephen C. Vladeck, New York City
(Vladeck, Elias, Frankle, Vladek & Lewis, New York City, Judith P. Vladeck

and Bernard Yaker, New York City, of counsel), for intervenor.

Elliott Moore, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C)., for petitioner.

Before MOORE and FRIENDLY, Circuit Judges, and BRYAN, District Judge.*

FRIENDLY, Circuit Judge.

This petition for enforcement raises an interesting question of law as to the power of the NLRB, see 156 N.L.R.B. 411 (1965). The facts were stipulated: On January 18, 1962, Penn Cork & Closures, Inc. entered into a collective bargaining agreement with District Lodge No. 15 of the International Association of Machinists with respect to its maintenance and production employees, effective from January 1, 1962 to December 31, 1964. Article II of the agreement was a union security clause complying with § 8(a) (3) of the National Labor Relations Act; the company agreed therein that within three working days after receipt of notice from the union it would discharge any employee who was not a member in good standing. Article III provided for checkoff of initiation fees and dues of employees who authorized the deduction; any such authorization was to be irrevocable for a year or until the termination date of the agreement, whichever sooner occurred, and thereafter for yearly periods unless revoked within ten days following the date when its irrevocability ceased. Many employees signed authorizations conforming to the agreement save that the period for revocation was fifteen rather than ten days after the end of any irrevocable period. On December 30, 1964, the company and the

union entered into a similar collective bargaining contract effective from January 1, 1965 until December 31, 1967. On January 5, 1965, employees petitioned the Board pursuant to § 9(e) (1) of the Act[1] for an election to determine whether the union security provisions of the agreement should be rescinded. The election was held on January 29, a majority so voted, and the Regional Director issued a certification on February 8. Later that month 57 employees delivered to the company and the union a signed statement that they had resigned from the union and that "no dues shall be deducted from our wages." The company declined to comply, except as to 19 employees for whom no checkoff had ever been made since they had not signed authorizations, on the ground that it remained bound by the checkoff clause in the contract; it agreed, however, to keep the withheld dues in a special fund pending judicial determination. After appropriate charge, complaint, stipulation of the facts, and waiver of a trial examiner's decision, the Board concluded that in continuing the checkoff as to these employees the company had violated § 8(a) (1) by interfering with their § 7 right to refrain from joining or assisting labor organizations, and § 8(a) (2) by rendering unlawful assistance and financial support to a labor organization; it directed the company to refund the dues of employees who had revoked their authorizations and to refrain from withholding them in the future. When the Board sought enforcement, the employer took no position, leaving opposition in the capable hands of counsel for the union, which has been allowed to intervene.

The Taft-Hartley Act as initially enacted prohibited execution of a union security agreement unless a majority of

---

* Of the Southern District of New York, sitting by designation.

1. This provides:
(e) (1) Upon the filing with the Board, by 30 per centum or more of the employees in a bargaining unit covered by an agreement between their employer and a labor organization made pursuant to section 8(a) (3), of a petition alleging they desire that such authority be rescinded, the Board shall take a secret ballot of the employees in such unit and certify the results thereof to such labor organization and to the employer.

the employees had approved it in a Board-conducted election, 61 Stat. 136, 141, 144–145 (1947). In administering this provision the Board was called upon to conduct thousands of elections, almost all of which were won by the union. 14 NLRB Ann.Rep. 6 (1949). To eliminate this burden, Congress in 1951 provided that union security agreements could be executed without prior employee authorization, and to continue "to safeguard employees against subjection to union-shop agreements which a majority disapproves," 2 U.S.Code Cong. & Adm.News, p. 2381 (1951), reprinting S.Rep.No. 646 (82d Cong. 1st Sess.), relied on the requirement, also contained in the 1947 Act, that the Board must conduct an election with respect to rescission of the union security clause when 30% of the employees requested, 65 Stat. 601–602 (1951).

The Board asserts that where a union shop exists under the authority of § 8 (a) (3), it is logical to infer that employees authorizing dues checkoffs do so under its influence. This inference is particularly compelling where, as here, the collective bargaining agreement obliges the company to dismiss a worker within three days of being notified by the union of his failure to maintain his good standing; under such an agreement an employee is likely to authorize a dues checkoff for fear that without it he may forget to make the payments and risk dismissal for failure to pay union dues. The Board argues that, once a § 9(e) (1) election has rescinded a union security clause, permitting an employer to continue to check off dues despite prompt resignations and dues-assignment revocations would undermine the freedom of election that Congress intended under § 9(e) (1), since rescission of the union security clause would be of little benefit if it did not provide relief from continued payment of union dues, very likely the principal reason workers would seek rescission.

■ The union argues that Congress could not have intended such a result. Its first reliance is upon § 302 which,

after making it unlawful for an employer to pay money to a representative of employees, § 302(a), says in subdivision (c) that this general condemnation shall not apply to various cases, one of which is

"(4) with respect to money deducted from the wages of employees in payment of membership dues in a labor organization: *Provided,* That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner."

The union contends that the Board is without authority to brand as an unfair labor practice any checkoff arrangement not illegal under § 302. The conclusion does not follow. Congress' determination that only certain checkoff arrangements should give rise to criminal penalties, § 302(d), or be enjoinable, § 302 (e), did not immunize all others from scrutiny under § 8 by the agency given responsibility for carrying out the declaration of policy in § 1.

■ The union is on stronger ground, although not strong enough, in its alternative argument that the Board had no sufficient basis for concluding that an employer violates §§ 8(a) (1) or (2) by continuing to honor checkoff authorizations which were prematurely revoked under the circumstances here presented. It stresses that many union security agreements do not have checkoff provisions and, more to the point, that there may be checkoff agreements without union security clauses. Since it would be hard to see how continued enforcement of the checkoff after purported revocation would be an unfair labor practice in the latter example, the union asks how this case differs; it complains also that it is left with the burden of administering the agreement without the sinews on which it had counted. But this argument too must fail. Here there is a union shop agreement which can be

said to have influenced the workers' decisions to authorize dues checkoffs, whereas in the union's hypothetical there is no such union shop agreement that could have influenced those decisions. The contention that the union assumed its duties as collective bargaining agent solely in reliance on its being able to compel dues from all employees does not impress us. For one thing, the union has cited nothing to show it could not lay down its burden if it wished. For another, it was established long before execution of the instant agreement that only if a deauthorization vote pursuant to § 9(e) (1) "immediately relieves employees of the obligations imposed by an existing union-security agreement can this [Labor] Board give effect to the basic congressional objective," Great Atlantic & Pacific Tea Co., 100 N.L.R.B. 1494, 1497 (1952); see also Andor Co., 119 N.L.R.B. 925 (1957); Monsanto Chemical Co., 147 N.L.R.B. 49 (1964); for the Board to view checkoffs authorized during the term of a union security agreement as being made under the influence of that agreement and therefore an "obligation imposed" by that agreement revocable after a § 9(e) (1) election is but a slight extension of this established doctrine and could not have come as a great surprise. As to the unfairness of leaving the union to discharge the duties of a collective bargaining representative without the sustenance of compelled dues, the 1947 Act prior to its amendment in 1951 required all unions to perform their collective bargaining functions without compelled dues until a majority in the bargaining unit, in a Board-conducted election, authorized a union security arrangement; there is no evidence that when Congress eased this requirement on the precise basis that the deauthorization election gave disenchanted employees the necessary protection, it meant to allow the

union to compel the payment of dues thereafter. The Board acted within the broad authority committed to it in the area of labor-management relations as the "tribunal appointed by law and informed by experience," Illinois Central R.R. v. ICC, 206 U.S. 441, 454, 27 S.Ct. 700, 51 L.Ed. 1128 (1907), in concluding that Congress intended the 1951 amendment to effect a procedural but not a substantive change [2] and that rescission of the union security clause as a result of a § 9(e) (1) election should also work a rescission of checkoffs authorized by employees because of the union security provisions.[3]

■ If employees had testified that they had authorized the checkoffs because of the union security agreement, there could scarcely be doubt of the Board's power to hold that rescission of the union security clause should release them from their authorizations. But even without such testimony the Board could draw on its general knowledge to conclude that a union security clause would be the procuring cause of checkoff authorizations for a substantial number of employees and could proceed from that to a decision that effective administration of the Act required a general rule, couched if need be in terms of a presumption, which would be available to all employees alike and would avoid the impossible administrative task of exploring the mental processes of thousands of workers. See Republic Aviation Corp. v. N. L. R. B., 324 U.S. 793, 800, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); Radio Officers' Union v. N. L. R. B., 347 U.S. 17, 45–46, 74 S.Ct. 323, 98 L.Ed. 455 (1954).

We do not read Local 60, United Bhd. of Carpenters, etc. v. N. L. R. B., 365 U.S. 651, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961), heavily relied on by the union, as withdrawing from the Board the au-

---

2. The Board has said this before. See, e. g., Great Atlantic & Pacific Tea Co., 100 N.L.R.B. 1494, 1495–97 (1952).

3. On the facts here, where the request for a deauthorization election came only six days after the new union security agreement, it is quite clear that the latter would have failed of the approval required by the Taft-Hartley Act as enacted.

thority, so important for an administrative agency, thus to fill gaps in the necessarily rather general legislation enacted by Congress. That decision, which condemned the Board's drastic "Brown-Olds" remedy whereby a union or employer violating the closed-shop provisions of the Taft-Hartley Act would be obliged to reimburse all employees for union dues or initiation fees retroactively to six months before the filing of the charge, see J. S. Brown-E. F. Olds Plumbing & Heating Corp., 115 NLRB 594 (1956), rested on the lack of any basis for inference that "even a single person joined the union with the view of obtaining work on this project" or that "any who had voluntarily joined the union was kept from resigning for fear of retaliatory measures against him." 365 U.S. at 654, 81 S.Ct. at 877. Furthermore, the Board's practice had been to refuse evidence that some employees voluntarily paid the dues which the *Brown-Olds* remedy would return to them as obtained by coercion. 365 U.S. at 657, 81 S.Ct. 875 (Harlan, J., concurring). Here, however, we know that a considerable number of employees resigned from the union and revoked checkoff authorizations as soon as the compulsion of the union security clause was removed by the election for which Congress provided, although they had failed to exercise their revocation rights only six weeks before when the authorizations were revocable according to their terms but the union security clause was still in effect.

It would indeed have been far better if the Board had conducted a rule-making proceeding under § 4 of the APA and, on suitable development of the facts, had formulated a rule so that employees would have known from the outset of the freedom here recognized and unions would have been aware of the attendant risks. Regrettable as is the Board's continued failure to use its rule-making powers, see SEC v. Chenery Corp., 332 U.S. 194, 202, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); N. L. R. B. v. A. P. W. Products Co., 316 F.2d 899, 905–906 (2 Cir. 1963); Peck, The Atrophied Rule-Making Powers of the National Labor Relations Board, 70 Yale L.J. 729 (1961); 1 Davis, Administrative Law Treatise, § 6.13 (1965 pocket part), we cannot say that, on the facts of this case where, as in SEC v. Chenery Corp., supra, the agency was dealing with an issue of first impression, its choice to proceed by the adjudicative route was beyond its power.

Enforcement granted.