**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BROTHERHOOD OF RAILWAY, AIRLINE AND STEAMSHIP CLERKS,** et al., Respondents.

No. 73-3626.

United States Court of Appeals, Fifth Circuit.

Aug. 9, 1974.

Elliott Moore, Deputy Assoc. Gen. Counsel, Peter M. Bernstein, Atty., N. L. R. B., Washington, D. C., Harold A. Boire, Director, Region 12, N. L. R. B., Tampa, Fla., for petitioner.

Gerald Schilian, New York City, for respondents.

Before BROWN, Chief Judge, and RIVES and DYER, Circuit Judges.

DYER, Circuit Judge:

The principal question posed by the Board's application for enforcement is whether the Union violated section 8(b)(2) and (1)(A) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., by causing the employer to deduct

union dues from wages pursuant to dues checkoff authorizations given prior to the severance of employees who were later rehired.[1] Also presented is the subsidiary question whether the Board's decision to decline referral to arbitration of the issue here presented was a proper exercise of its discretion. We agree with the Board that there was a violation of the Act by the Union, and that the Board properly exercised its discretion with respect to arbitration. Accordingly, we enforce the Board's order in full.

The facts are simple and undisputed. The employees in question had each signed dues checkoff authorization cards. Two employees voluntarily terminated their relationship with the Yellow Cab Company, their employer, during a strike and went to work for another taxicab operation. One employee returned to Yellow Cab about four months later, and the other returned after about five months. Another employee voluntarily quit his employment and was rehired ten months later. Two others were discharged by the Company because of "chargeable accidents," but after some two years had passed they, too, were rehired. In each instance the employees made a clean break with the Company. Upon being rehired, all of the employees lost their seniority. None of the employees executed new authorizations. In spite of this, the Union requested and secured the deduction of union dues from their wages.

The issue to be decided is finely drawn. The Board's position is that when an individual severs his employment relationship, he also severs any obligation under a signed checkoff authorization, and that the obligation cannot be revived until the individual has signed a new authorization. The fundamental issue, therefore, is whether severance has in fact occurred, and not why. The Union counters that a reasonable revocation procedure is that set forth in section 302 of the Act,[2] reproduced on the checkoff cards signed by the charging parties, and that the Board's powers in this respect are, or should be, circumscribed by the criminal provisions of that section. Accordingly, the terms of the checkoff cards should control the relationship between the parties.

■ Basic to the Union's argument is the fact that employment in the taxicab industry is highly transient in nature. The Union contends that the financial impact on the local unions of "in again-out again" members could be potentially devastating and render the Union impotent in dealing with employees. We are unpersuaded either that such dire consequences will flow from the Board's rule or that the Union's position is sound.

It is obvious that the checkoff is nothing more than a method of paying dues. The employment relationship is intrinsically involved, and it would seem to necessarily follow that a termination of that relationship terminates the checkoff authorization, irrespective of any incidental effect on union security. Equally obvious is the fact that all the Union has to do if and when an employee is rehired is to obtain a new authorization.

■ The Union, however, suggests that the Board's powers are delimited by the proscriptions of section 302 of the

1. In pertinent part the authorization provides: "This authorization and assignment shall be irrevocable for the term of the applicable contract between the Union and the Company, or for one year, whichever is the lesser, and shall automatically renew itself for successive yearly or applicable contract periods thereafter, whichever is the lesser, unless I give written notice to the Company and the Union at least 60 days and not more than 75 days before any periodic renewal date of this authorization and assignment of my desire to revoke the same."

2. Section 302, 29 U.S.C.A. § 186, makes it unlawful for an employer to pay money to a representative of a union, but there is an exception "with respect to money deducted from the wages of employees in payment of membership dues in a labor organization: *Provided,* That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner."

Act.[3] A short answer to this contention was made by the Second Circuit in N. L. R. B. v. Penn Cork & Closures, Inc., 2 Cir. 1967, 376 F.2d 52, 55, cert. denied, 389 U.S. 843, 88 S.Ct. 89, 19 L.Ed.2d 109. There the court said:

> The union contends that the Board is without authority to brand as an unfair labor practice any checkoff arrangement not illegal under § 302. The conclusion does not follow. Congress' determination that only certain checkoff arrangements should give rise to criminal penalties, § 302(d), or be enjoinable, § 302(e), did not immunize all others from scrutiny under § 8 by the agency given responsibility for carrying out the declaration of policy in § 1.

■ The Union next turns its attack on the Board's findings as not being supported by substantial evidence on the record as a whole. To support its contention the Union assumes, *arguendo*, that a complete severance of the employment relationship voids a dues checkoff authorization, and then argues that the record does not support the conclusion that the employees *were completely severed*. This is accomplished by adopting the "standard" established by the N.L.R.B. in Industrial Towel and Uniform Service, 195 N.L.R.B. 1121, *enforcement denied*, 6 Cir. 1973, 473 F.2d 1258, a case in which the Board *found* that the employee in question had no intention of returning and had no reasonable expectancy of reemployment. However, the Board *held* in *Industrial Towel* "that when an individual severs his employment relationship, he also severs any obligation under a signed checkoff authorization and that such obligation cannot be revived until the individual has signed a new authorization." The Sixth Circuit did not reject the Board's theory. It simply found that since the employee left the company because of illness and later returned to work at a new position commensurate with her reduced physical abilities she was not rehired as

a new employee. "Since [the employee] did not sever her employment relationship and since no revocation of the checkoff authorization form was attempted, the authorization continued to be valid. . . ." *Id.* at 1261.

Under its open-ended interpretation of *Industrial Towel,* the Union relates the several employees' motivations for leaving the Company and their subjective notions of their chances for reemployment, and concludes that two of them always considered themselves to be employees of Yellow Cab and in reality had no intention of remaining with the other taxicab company; that the absence of two drivers for four and five months respectively was an intentional subterfuge with the object of prematurely terminating their relationship with the Union; and that the two employees who were fired used the Union to regain their employment. All of this adds up, says the Union, to only one conclusion, that there was no severance of the employment relationship. We disagree.

■ The Union's argument and the questions posed in its brief—"What does it mean then, when a driver leaves a particular company and returns sometime later? Has he really quit? Is his employment relationship severed? Does he feel that he will never be permitted to return? Should a union have to get a newly signed card every year? Or every six months? What standards shall we apply to determine when an employment hiatus becomes a complete severance of the employment relationship?"—underscore the merit of the Board's position that in determining whether there has been a permanent severance, the Board will not consider the employee's motivation for leaving his employment or his subjective thoughts concerning his chances for reemployment. If a severance has in fact occurred, that ends the matter. We agree with the Board that "[t]o require the Union and the employer to look into and then evaluate an employee's motivation

for severing his employment would place a burden on them far greater than that envisioned by the Act." The objective test relieves the parties of the possibility of unfair labor practice sanctions being imposed if their analysis of subjective motivation differs from that of the Board, and defines what otherwise would be an uncertain and litigious area. We therefore reject the Union's position "that requires a probe of an employee's subjective motivations . . . involving an endless and unreliable inquiry." N. L. R. B. v. Gissel Packing Co., 1969, 395 U.S. 575, 608, 89 S.Ct. 1918, 1937, 23 L.Ed.2d 547.

■ All agree that the dues checkoff arrangement must be with the employee's consent, and that an employer who checks off union dues from an employee's pay and remits the proceeds to the union without the employee's written authorization violates section 8(a)(2) and (1) of the Act. Chun King Sales, Inc., 126 N.L.R.B. 851 (1960). A checkoff authorization containing language that it is irrevocable is not necessarily controlling. See N. L. R. B. v. Penn Cork & Closures, supra, 376 F.2d at 55–56. Since the fundamental basis for the checkoff is the voluntary consent of an employee, a severance of employment extinguishes the effectiveness of the checkoff, and it is not automatically renewed if the employee subsequently reenters the Company's employ.[4]

■ We turn now to the Union's assertion that the NLRB should have deferred to the arbitration process the matters here in issue since they are arbitrable under the collective bargaining agreement. Collyer Insulated Wire, 192 NLRB 837 (1971). The Union concedes that its interests are different than those of the charging parties but suggests that there is no showing that the Company would not have undertaken to fully litigate their position. We are wholly unpersuaded.

The interests of the employees and the Union are in direct conflict in this case. The interests of Yellow Cab were not affected, and it could not be expected to undertake the protection of the employees, especially in view of its initial acquiescence in the Union's improper demand that the dues checkoff be resumed without new authorizations when the employees were rehired. The Company was neither under an obligation to nor did it invoke the grievance-arbitration procedure in behalf of the employees.

■ While the Board may defer to arbitration where a dispute presents issues cognizable under both the Act and the collective bargaining agreement, Associated Press v. N. L. R. B., D.C.Cir. 1974, 492 F.2d 662, the mere presence of an arbitration clause in a bargaining agreement does not foreclose the Board's jurisdiction and consideration of an unfair labor practice which also constitutes a breach of the agreement. Office and Professional Employees International Union, Local 425 v. N. L. R. B., 1969, 136 U.S.App.D.C. 12, 419 F.2d 314. See also N. L. R. B. v. Strong, 1969, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546; Carey v. Westinghouse Electric Corp., 1964, 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320.

■ We think it is especially desirable, if not required, that the Board make sure that the parties' rights are safe-

4. The Union's contention that employee Cercy's revocation letter was ineffective because it was received on the 76th day rather than the 75th day before the renewal date, computed by including both terminal dates, is without merit. The Board properly followed the rule set forth in 29 C.F.R. § 102.114(a): "In computing any period of time prescribed or allowed by these rules, the day of the act, event, or default after which the designated period of time begins to run, is not to be included."

We also agree with the Board that absent an exception by the Union to the Administrative Law Judge's findings that employees Miller and Abbott suffered dues checkoffs after their effective revocation of their membership and authorization cards, the Union may not challenge the findings before this Court. N. L. R. B. v. Ochoa Fertilizer Corp., 1961, 368 U.S. 318, 322, 82 S.Ct. 344, 7 L.Ed.2d 312; Nix v. N. L. R. B., 5 Cir. 1969, 418 F.2d 1001, 1009.

guarded by refusing to defer to arbitration in those cases in which the interests of the charging party are not in substantial harmony with the party expected to fairly and effectually process the grievance through arbitration proceedings.

Enforced in full.