SCHOOL COMMITTEE OF GREENFIELD *vs.* GREENFIELD
EDUCATION ASSOCIATION & others.

Franklin.  September 18, 1981. — January 14, 1982.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN & LYNCH, JJ.

*School and School Committee,* Collective bargaining.  *Arbitration,*
Arbitrable question.  *Labor,* Union agency fee.  *Administrative Law,*
Primary jurisdiction.  *Constitutional Law,* Union, Freedom of speech,
Freedom of association.  *Declaratory Judgment.  Statute,* Construction.

An action brought by a school committee against a teachers' association
and two tenured teachers, seeking a declaratory judgment pursuant to
G. L. c. 231A, as to whether it could dismiss the teachers on demand
of the association, disclosed an "actual controversy," under circum-
stances indicating the existence of a collective bargaining agreement
requiring nonmembers of the association to pay an agency service fee
as a condition of continued employment and providing for arbitration
of all grievances, the refusal of the teachers to pay the fee and of the
committee to dismiss them, the denial of the association's grievance by
the committee, and a demand for arbitration by the association. [74]
A stay of arbitration of a grievance may be granted where the interests
of the employee and the bargaining representative are in direct con-
flict and it is not clear that the employer would represent the interests
of the employee.  [74-75]
Where the principal issues involved in a determination whether a school
committee could dismiss two tenured teachers on demand of a teachers'
association for failing to pay a nonmember agency service fee were an
alleged statutory bar to dismissal of the teachers despite the terms of
the collective bargaining agreement and a constitutional challenge to
the procedure by which the permissible agency fee was determined,
and neither question had been committed to the jurisdiction of the
Labor Relations Commission, the doctrine of primary jurisdiction did
not apply.  [76]
Discussion of the construction and constitutionality of G. L. c. 150E,
§ 12, providing procedures for payment and rebate of a service fee
paid by a public employee to a bargaining organization as a condition
of employment.  [77-85]

CIVIL ACTION commenced in the Superior Court Department on August 16, 1979.

The case was heard by *Smith*, J., on motions for summary judgment, and was reported by him to the Appeals Court. The Supreme Judicial Court granted a request for direct review.

*Brian A. Riley* for Greenfield Education Association.

*Bruce E. Mohl*, Assistant Attorney General, for the Attorney General, intervener.

*Bruce N. Cameron* of Georgia (*Jack D. Curtiss* with him) for Shirley Hornketh & another.

*Abraham Margolis* for the plaintiff.

LIACOS, J. The School Committee of Greenfield (committee) brought this action against the Greenfield Education Association (association) and two tenured teachers, Shirley Hornketh and Joy Davenport (teachers), seeking a declaratory judgment as to whether it could dismiss the teachers on demand of the association without violating the statutory or constitutional rights of the teachers. A judge of the Superior Court allowed the committee's motion for partial summary judgment and ordered a stay of arbitration of a grievance asserted by the association against the committee and the two teachers. The grievance, brought under a collective bargaining agreement then in force between the association and the committee, sought the dismissal of the teachers for failure to pay an agency service fee required by the agreement. The teachers cross claimed against the association, alleging its internal procedure for the rebate of impermissibly-obtained fees violated their rights pursuant to the First Amendment to the United States Constitution. The trial judge, in addition to granting the committee's motion for summary judgment, denied the association's motion for summary judgment, and reported his decision to the Appeals Court. Mass. R. Civ. P. 64, 365 Mass. 831 (1974). The Appeals Court allowed the Attorney General to intervene in the appeal as a defendant, and we granted the association's motion for direct appellate review. We now affirm, with certain modifications, the orders of the Superior Court judge.

The material facts are not in dispute. At all relevant times, the committee and the association were parties to a collective bargaining agreement which required teachers who were not association members to pay an agency service fee to the association "commensurate with the cost of collective bargaining and contract administration as determined by the Association," as a condition of continued employment. Public employers are permitted to enter into such agency shop agreements by G. L. c. 150E, § 12, the text of which is set out in the margin.[1] This agreement also provided

[1] General Laws c. 150E, § 12, as amended by St. 1977, c. 903, provides in pertinent part: "The commonwealth or any other employer shall require as a condition of employment during the life of a collective bargaining agreement so providing, the payment . . . of a service fee to the employee organization which in accordance with the provisions of this chapter, is duly recognized by the employer or designated by the [labor relations] commission as the exclusive bargaining agent for the unit in which such employee is employed; provided, however, that such service fee shall not be imposed unless the collective bargaining agreement requiring its payment as a condition of employment has been formally executed, pursuant to a vote of a majority of all employees in such bargaining unit present and voting. . . . The amount of such service fee shall be equal to the amount required to become a member and remain a member in good standing of *the exclusive bargaining agent and its affiliates* to or from which membership dues or per capita fees are paid or received. No employee organization *shall* receive a service fee as provided herein unless it has established a procedure by which any employee so demanding *may* obtain a rebate of that part of said employee's service payment, if any, that represents a pro rata share of expenditures by *the organization or its affiliates* for:

"(1) contributions to political candidates or political committees formed for a candidate or political party;

"(2) publicizing of an organizational preference for a candidate for political office;

"(3) efforts to enact, defeat, repeal or amend legislation unrelated to the wages, hours, standards of productivity and performance, and other terms and conditions of employment, and the welfare or the working environment of employees represented by the exclusive bargaining agent or its affiliates;

"(4) contributions to charitable, religious or idealogical [*sic*] causes not germane to its duties as the exclusive bargaining agent;

"(5) benefits which are not germane to the governance or duties as bargaining agent, *of the exclusive bargaining agent or its affiliates* and available only to the members of the employee organization.

"It shall be a prohibited labor practice for *an employee organization or its affiliates* to discriminate against an employee on the basis of the em-

for the arbitration of all grievances, and defined grievance to include any violation or misinterpretation of the agreement.

The association notified all teachers in September, 1978, that membership dues for the school year would be $158 and the agency service fee would be $153. It requested Hornketh and Davenport, who are not members, to pay the fee in October. They did not pay. In November, the association requested that the committee comply with the agreement by discharging the teachers. In December, the association posted a notice in all school buildings stating that all nonmembers could seek a rebate through the procedures of the Massachusetts Teachers Association and the National Education Association after the entire fee was paid.

Hornketh and Davenport continued to refuse to pay the fee. On April 30, 1979, they were notified by the superintendent of schools that the committee would consider their dismissal on June 19, pursuant to an association request. The committee held a hearing on May 31 at which the teachers stated that they objected to the uses to which the fee would be put, and the association offered to drop its request for dismissal if the fees were paid into an "escrow account" to be administered by it pending a determination by the Labor Relations Commission of the allowable amount of the fee. See 402 Code Mass. Regs. § 17.05(2) (1978). The teachers refused to pay the fee, but on June 19 the committee voted nevertheless not to dismiss them. The association filed a grievance with the committee, asserting that this vote violated the agreement. The grievance was denied; the association then demanded arbitration, and this action was brought by the committee in Superior Court.

The questions reported by the judge may be reduced to the following: (1) whether this action presents an actual controversy under G. L. c. 231A; (2) whether the stay of arbitration was properly granted; (3) whether this action should have been stayed pending administrative action; (4) whether

---

ployee's membership, nonmembership or agency fee status in the employee organization or its affiliates" (emphasis supplied).

dismissal of these teachers would violate the teachers' tenure act, G. L. c. 71, §§ 41, 42; and (5) the proper construction and constitutionality of G. L. c. 150E, § 12, as amended.

1. *"Actual controversy."* This action was brought for declaratory and injunctive relief under G. L. c. 231A, §§ 1, 5. Section 1 authorizes the Superior Court to "make binding declarations of right . . . either before or after a breach or violation . . . in any case in which an actual controversy has arisen."

There can be no doubt that an actual controversy has arisen here. The association allegedly initiated arbitration proceedings, and the committee was placed in the dilemma of either violating what appear to be the plain terms of the collective bargaining agreement or possibly violating the statutory and constitutional rights of the teachers. These circumstances "plainly indicate that unless the matter is adjusted [these] antagonistic claims will almost immediately and inevitably lead to litigation." *School Comm. of Cambridge* v. *Superintendent of Schools of Cambridge*, 320 Mass. 516, 518 (1946).

2. *Stay of arbitration.* The association contends that the trial judge was prohibited from granting a stay of arbitration in this case by G. L. c. 150C, § 2 (*b*). Section 2 expresses a preference for arbitrating labor disputes, permitting stays only where there is either no "agreement to arbitrate" or "the claim sought to be arbitrated does not state a controversy covered by the provision for arbitration." The association argues that since its grievance asserted only that the committee violated the agreement by failing to dismiss the teachers, the agreement to arbitrate governed and the stay was improper. The committee argues that the dismissal of teachers involves a nondelegable function of a school committee and hence is not arbitrable. Further, the committee argues that the issues involved in this dispute directly implicate the constitutional and statutory rights of the teachers, and hence the dispute is not arbitrable. The teachers join in this latter argument and add that arbitration is inappropriate because they are not parties to the collective bargaining

agreement and would have neither a voice in the selection of the arbitrator nor a right to participate in the arbitration proceedings. We need not consider all of these contentions to determine that the judge did not err in ordering a stay of arbitration.

The claim submitted to arbitration primarily concerned the rights and responsibilities of the teachers who, as third parties, would have had no right to participate in the arbitration proceedings. Cf. *Norton* v. *Massachusetts Bay Transp. Auth.*, 369 Mass. 1 (1975) (employee has no individual right to compel employer to arbitrate grievance absent breach of union's duty of fair representation). The teachers' interests obviously would not be adequately represented by the association, and they had no reason to believe the committee would fully represent them. We hold that a stay of arbitration may be granted where the interests of the employee and the bargaining representative are in direct conflict and it is not clear that the employer would represent the interests of the employee. The mere presence of an arbitration clause in a bargaining agreement does not foreclose the issue. See *NLRB* v. *Brotherhood of Ry., Airline & S.S. Clerks*, 498 F.2d 1105, 1109 (5th Cir. 1974) (NLRB properly refused to defer to arbitration where interests of employee and union were in direct conflict and employer could not be expected to undertake protection of employee's interests).

3. *Labor Relations Commission jurisdiction.* The association contends that its motion for summary judgment on the teachers' cross claim should have been allowed due to the teachers' failure to exhaust available remedies before the commission.[2] This is technically an issue of primary jurisdiction, rather than exhaustion, since there was no pending administrative proceeding when this action was brought,

---

[2] There is some indication in the record that the association filed a prohibited practice charge against the committee for refusing to discharge the teachers, and that the commission dismissed the charge. The trial judge did not rely on this action by the commission in reaching his decision, nor do we.

but, as we have noted elsewhere, the same concern for the relationship between agencies and the courts underlies both doctrines. *Murphy* v. *Administrator of the Div. of Personnel Administration,* 377 Mass. 217, 220-221 (1979).

The doctrine of primary jurisdiction, which counsels a court to stay its hand when the issue in litigation is within the special competence of an agency, "does not apply, however, when the issue in controversy turns on questions of law which have not been committed to agency discretion." *Id.* at 221. The principal issues here are an alleged statutory bar to dismissal of the teachers despite the terms of the collective bargaining agreement and a constitutional challenge to the procedure by which the permissible agency fee amount is determined. Neither of these questions has been committed to the jurisdiction of the commission. Also, resolving these issues will affect many nonparties, making it appropriate for judicial rather than administrative determination. Cf. *East Chop Tennis Club* v. *Massachusetts Comm'n Against Discrimination,* 364 Mass. 444, 450 (1973) (suspension of exhaustion requirement would be warranted where case involves public questions affecting nonparties).

The factual issues that will remain after these questions are answered are technical issues within the expertise and jurisdiction of the commission, and thus should be tried there in the future. General Laws c. 150E, § 12, as we construe it below, prohibits an employee organization from assessing an agency service fee in excess of an employee's proportional share of collective bargaining, contract administration, and grievance expenses, and any violation of § 12 is a prohibited labor practice within the jurisdiction of the commission. G. L. c. 150E, §§ 10 (*b*) (1), 11. Cf. 402 Code Mass. Regs. § 15.01-15.12 (1978). Accordingly, it will be for the commission to determine, on complaint by a dissenting employee in the future, the amount an employee organization and its affiliates may assess as an agency service fee.[3]

---

[3] The commission has established by regulation two different procedures that arguably apply to such a determination. 402 Code Mass. Regs. § 15.01 et seq. (1978) permits employees to bring charges before the com-

4. *Statutory tenure protection.* The teachers and the committee contend that the prohibition against discharge of tenured teachers except for good cause, G. L. c. 71, § 42, protects them from dismissal for failure to pay the agency service fee. The trial judge has reported this question. We conclude that, in light of our disposition of this case, we need not reach this issue. No decision to discharge the teachers has been taken. The teachers and the committee concede the right of the association to require payment of agency service fees by the teachers under G. L. c. 150E, § 12. Indeed, the teachers have paid into court, pursuant to an order of the judge, the full amount sought by the association. Thus, the only viable issue here is by what means the allocation of the lawful amount due the association is to be determined.

5. *Constitutionality of G. L. c. 150E, § 12.* General Laws c. 150E, § 12, authorizes negotiation of public sector collective bargaining agreements which may require the payment of an agency fee "as a condition of employment" of a public employee. Such a provision is included in the agree-

---

mission that an employee organization has committed a prohibited labor practice. This procedure will adequately protect the teachers as long as it is applied with the understanding that the teachers may be compelled only to express their general objection, and that all other burdens of proof fall on the association. See *id.* at § 15.09.

The second procedure is designed specifically to implement § 12 and provides an alternative means to challenge the validity of a fee. 402 Code Mass. Regs. § 17.01 et seq. (1978). Section 17.03 establishes the requisites of an allowable agency service fee in greater detail than the specifications of § 12 and indicates that fees complying with the regulation will "be presumed valid." *Id.* at § 17.03(1). This regulation appears to condition the employee's right to contest the validity of a fee on receipt of a decision terminating his or her employment for failure to pay it. *Id.* at § 17.05(2). If this were to be an employee's sole remedy, it would likely present constitutional difficulties by imposing such a great risk on the employee's attempt to enforce his or her First Amendment rights. Any presumption of validity *prior* to a determination whether the fee comports with § 17.03(2), (3), and (4) would also likely run afoul of the constitutional requirement that the organization bear the burden of proving the assessed fee legitimate. *Abood* v. *Detroit Bd. of Educ.,* 431 U.S. 209, 239-240 n.40, 241 (1977). See also *Brotherhood of Ry. & S.S. Clerks* v. *Allen,* 373 U.S. 113, 118, 122 (1963).

ment at issue in the case at bar. It is beyond dispute and the teachers concede that they may be forced to pay their proportional share of collective bargaining, contract administration, and grievance adjustment expenses. Also, all parties agree that the teachers may *not* be forced to support the social, political, or speech activities of the association. See *Abood* v. *Detroit Bd. of Educ.*, 431 U.S. 209 (1977). The association admits that a portion of the agency fee assessed here is used for the latter purposes.

The association argues, however, that G. L. c. 150E, § 12, requires the teachers to pay the fee to the association and then to exhaust the association's internal rebate procedure before challenging the amount of the fee before another tribunal. The association views the statutory language found in § 12, "No employee organization shall receive a service fee . . . unless it has established a procedure by which any employee so demanding may obtain a rebate" of the portion of the fee which involves expenditures by the "organization or its affiliates" of monies for political, social, or charitable purposes (described in G. L. c. 150E, § 12, as amended by St. 1977, c. 903) not only to be in compliance with the mandate of *Abood,* but also as requiring the teachers to submit to the association rebate procedure as their primary remedy.[4]  The teachers assert in opposition

---

[4] While our decision today does not depend on the characteristics of the specific internal rebate procedures available to the teachers, it is instructive to summarize the remedy available to them in this case. The $153 fee demanded from the teachers would be allocated among three distinct entities ($10 to the association, $108 to the Massachusetts Teachers Association, and $35 to the National Education Association) each with a *separate* rebate procedure. While these three procedures are similar, and there is a possibility that the MTA and NEA procedures could be consolidated, there is little assurance that the burden of proof will be placed on the collecting organizations and no assurance that the teachers will have any access to the books and records of the organizations. The NEA procedure would apparently permit collection for expenses prohibited by G. L. c. 150E, § 12 (5). The procedures of each organization require them to make a unilateral assessment of the probable percentage of their expenses that will be used for political activity for the following year and place that amount in an escrow account for each objecting employee. A final unilateral assessment is then made *after* the end of the fiscal year, and that

that the procedure required under the association's view of § 12 would unduly infringe on the rights guaranteed to them by *Abood.* They argue that this procedure would infringe on their rights impermissibly in two distinct ways: first, it would deny them due process of law if the initial decision on fee allowability is made by the association, which has an obvious stake in the controversy; and second, it would violate their First Amendment rights if they must first pay the entire amount to the association, allowing it to use the funds in the interim for social, political, and speech activities, and depriving them of the use of the funds for their own expressive activities.

If § 12 were viewed as requiring resort to the association rebate procedure, it would render the statute constitutionally suspect on First Amendment grounds for reasons we explain below, without an adequate countervailing legislative justification. It is our duty to construe statutes so as to avoid such constitutional difficulties, if reasonable principles of interpretation permit it. *Globe Newspaper Co.* v. *Superior Court,* 379 Mass. 846, 853 (1980). *Staman* v. *Assessors of Chatham,* 351 Mass. 479, 487 (1966).[5] Where the

---

amount is sent to the employee. The dissatisfied employee may then appeal to the executive committee of the relevant organization. If still dissatisfied, the employee can go to arbitration (in Washington, D.C., for the NEA; in Boston for the MTA); however the arbitrator is bound to each organization's definition of "political activity." The organizations have bound themselves to establish the prima facie validity of their charges before the arbitrator.

The position of the association is that only after these rebate procedures (including arbitration) are exhausted can the employee then seek recourse elsewhere. Further, the association argues that such recourse must be sought before the Labor Relations Commission before any court action may be initiated. Nothing is said pertaining to whether the commission would have any right to bind the NEA. The procedures appear not only cumbersome but designed to discourage all but the most zealous employee.

[5] Faced with similar claims that the constitutional rights of nonmembers precluded collection of union fees which might be spent for political purpose by virtue of § 2, Eleventh, of the Railway Labor Act (45 U.S.C. § 152, Eleventh [1976]), the United States Supreme Court stated in *International Ass'n of Machinists* v. *Street,* 367 U.S. 740, 749 (1961): "These are questions of the utmost gravity. However, the restraints against un-

draftsmanship of a statute is faulty or lacks precision, it is our duty to give the statute a reasonable construction. *Massachusetts Comm'n Against Discrimination* v. *Liberty Mut. Ins. Co.*, 371 Mass. 186, 190 (1976). We presume that in interpreting a statute the Legislature had knowledge of constitutional requirements existing when it enacted or amended the statute. See *MacQuarrie* v. *Balch*, 362 Mass. 151, 152 (1972); *Lynch* v. *Commissioner of Educ.*, 317 Mass. 73, 79-80 (1944).

Section 12 was first enacted in 1973, prior to the *Abood* decision, by St. 1973, c. 1078, § 2. The second paragraph of § 12, apparently setting the agency fee equal to membership dues but disqualifying organizations without rebate procedures from receiving them, was added by amendment in 1977, after the *Abood* decision. St. 1977, c. 903. This 1977 amendment also removed a requirement that the fee "be proportionately commensurate with the cost of collective bargaining and contract administration." St. 1973, c. 1078, § 2. The five categories of expenditures listed in § 12, second par., manifest the Legislature's intent to limit the amount of the agency fee which may be collected from nonmember employees who have expressed their objections to financing those activities.[6]

---

necessary constitutional decisions counsel against their determination unless we must conclude that Congress, in authorizing a union shop under § 2, Eleventh, also meant that the labor organization receiving an employee's money should be free, despite that employee's objection, to spend his money for political causes which he opposes. Federal statutes are to be *so construed as to avoid serious doubt of their constitutionality.*" The Court then went on to give § 2, Eleventh, a "strained construction" to avoid having to decide difficult constitutional questions. *Abood, supra* at 247-248 (Powell, J., concurring). We need not go so far in properly construing G. L. c. 150E, § 12. Compare the language of § 2, Eleventh, with G. L. c. 150E, § 12 (1)-(5).

[6] The Attorney General and the association argue, and we agree, that these amendments were enacted to conform with *Abood*. They further argue, however, that to require public employees to submit to the association rebate procedure is consistent with the intent of the Legislature and the *Abood* decision and would not violate the rights of the teachers. We address this contention below.

Section 12, as amended, clearly requires an employee organization that seeks to collect an agency fee from nonmembers to establish a rebate procedure and make it available to dissenting employees. The statute does not describe the nature of the procedure, nor does it specifically refer to an internal union procedure. The statute does not clearly mandate that the dissenting employee avail himself of that procedure exclusive of all other remedies, nor does it require that the association be given use of the agency fee in the interim. Compare the language of G. L. c. 150E, § 12, as to the union: "No employee *organization shall* receive a service fee . . . *unless* it has established a procedure," and as to the employee: "by which any employee so demanding *may* obtain a rebate" (emphasis supplied). It is axiomatic in statutory construction that the word "shall" is an imperative and that the word "may" does not impose a mandate but simply authorizes an act. See *Johnson* v. *District Attorney for the N. Dist.,* 342 Mass. 212, 215 (1961); *Turnpike Amusement Park, Inc.* v. *Licensing Comm'n of Cambridge,* 343 Mass. 435, 437 (1962). The obligation of the statute is not with the employee, as the association contends, but solely with the association. The employee may or may not choose to avail himself of this procedure.

We believe our reading of the statute to be consistent with the teaching of *Abood.* The Supreme Court in *Abood* noted the possibility that the employees there might voluntarily use the union's internal rebate procedure, rendering further judicial proceedings unnecessary, 431 U.S. at 240 n.41, 242, but specifically refused to rule on the constitutional sufficiency of that remedy. *Id.* at 242 n.45. Nowhere did the Court state that were such a procedure made available the employee would be bound to use it.[7]

---

[7] The Court in *Abood* suggested that the Michigan court might defer further proceedings on remand if it viewed it to be appropriate under Michigan law "to defer further judicial proceedings pending the *voluntary* utilization by the parties of [the newly adopted union internal remedy] as *a possible* means of settling the dispute" (emphasis supplied). *Abood, supra* at 242. See also *Abood's* description of the Court's prior

The Court also emphasized the concern, expressed in *Brotherhood of Ry. & S.S. Clerks* v. *Allen*, 373 U.S. 113, 118, 122 (1963), that the procedure for separating permissible from impermissible expenses not place too great a burden on the employees, since it is their constitutional rights that are being diminished. *Abood, supra* at 239-240 n.40, 241. It was this concern which led the Court in *Allen* and *Abood* to require dissenting employees to enter only a general objection to support of the organization's activities, and after such a general objection to place the burden on the organization to justify its expenditures as being within the permitted categories. *Id.*

There is no constitutional or statutory justification, to which our attention has been directed, for requiring a dissenting employee to resort to the type of internal rebate procedure involved in this case. Such a requirement would undermine the burden that the Supreme Court in *Allen* and *Abood* has explicitly placed on the association of justifying the fee it assesses whenever a general objection is entered. This burden is only meaningful if legitimacy is proved before a neutral tribunal and subjected to judicial review. An initial determination by the association, followed by arbitration (before an arbitrator who may or may not be expert in organization expenses and accounting), followed by limited judicial review under G. L. c. 150C, § 11, are simply insufficient to guarantee that the onus of justification remain at all times on the association.

We find ourselves in substantial agreement with the court in *Ball* v. *Detroit*, 84 Mich. App. 383 (1978), which not only

---

language in *Allen, supra*: "Recognizing the difficulties posed by judicial administration of such a remedy, the Court also *suggested* that it would be *highly desirable* for unions to adopt a '*voluntary* plan by which dissenters would be *afforded* an internal union remedy'" (emphasis supplied). *Abood, supra* at 240. Such language clearly does not establish that it is constitutionally mandated that the dissenting employee use such a remedy. See *Beck* v. *Communications Workers*, 468 F. Supp. 87, and S. C. 468 F. Supp. 93 (D. Md. 1979). Nor, as we have stated, do we discover such a legislative intent in enacting the amendments to G. L. c. 150E, § 12, following the *Abood* decision.

refused to force dissenting teachers to resort to the internal union procedure in the first instance but also precluded union use of the money pending judicial determination of the permissible amount. *Id.* at 393-394, 397. We hold, as did the *Ball* court, that the statutory right of the organization to the permissible amount is outweighed by the potential that the impermissible amounts will be used, even temporarily, in violation of the dissenting teachers' First Amendment rights.

We have considered the cases in other jurisdictions which appear to uphold a requirement that dissenters resort to internal organization rebate procedures. The first of these is an advisory opinion which does not address the issues before us. See *Opinion of the Justices*, 401 A.2d 135 (Maine 1979). The Justices of the Supreme Judicial Court of Maine were asked to advise the Legislature whether an agency fee of 80% of union dues was valid absent a prior evidentiary hearing. The Justices of the Maine court responded that such a fee would not be invalid, but "the fact the amount of the service fee is fixed by the collective bargaining agreement does not make that amount conclusive upon a nonmember who puts the amount in issue in an appropriate judicial proceeding." *Id.* at 148. We consider the case of *Association of Capitol Powerhouse Eng'rs* v. *State*, 89 Wash. 2d 177 (1977), to misconstrue the mandate of *Abood.* We also note that the statute involved in that decision, Wash. Rev. Code § 41.06.150, as amended in 1973, is differently phrased and that the Washington court relied on a factual finding that there was a "publicized, 'readily accessible' procedure for refund of monies which would otherwise be used for political purposes to which an employee objects." *Id.* at 188-189. There is no such finding here and, indeed, the rebate procedure here is cumbersome to the extreme. See note 4, *supra.* But cf. *Ball* v. *Detroit, supra* at 396-397 (dissenters must exhaust union procedure in all future challenges after initial judicial assessment).

Mandating resort to the rebate procedure here would produce a further constitutional difficulty because of the re-

quirement that the entire fee be paid to the association pending proof of legitimacy. This interim payment, as the teachers contend, not only deprives them of the opportunity to engage in expressive activities with those funds but also forces them to subsidize the objectionable activities of the organization. Justice Stevens wrote a concurring opinion in *Abood* primarily to warn against any implication that employees could be forced to subsidize, even temporarily, activities they found objectionable. *Abood, supra* at 244. We agree: the teachers should not be required to suffer an interim *constitutional* deprivation, while the association is deprived only of funds to which it is entitled by statute and agreement.[8]

We find unpersuasive those cases which uphold a requirement that the fee be paid to the organization pending a determination, judicial or otherwise, of the permissible amount. See *White Cloud Educ. Ass'n* v. *White Cloud Bd. of Educ.*, 101 Mich. App. 309 (1980); *Browne* v. *Milwaukee Bd. of School Directors*, 83 Wis. 2d 316, 335-340 (1978).

The Court's holding in *Allen, supra* at 119-120, that an injunction against any collection of dues by the union was improperly granted as too damaging to the union is distinguishable. First, *Allen* involved a remedy for a statutory violation; the Court did not focus on or reach the constitutional issue until some fourteen years later in *Abood*. Second, the *Allen* Court did not consider the alternative of requiring dissenting employees to pay the disputed fee into an escrow account. Escrowing the fees ensures that the organ-

---

[8] Since the teachers here assert a constitutional deprivation, we are hardly in a position to label it de minimis solely because small amounts of money are at stake. It is notable that the Federal courts have jurisdiction over suits alleging deprivation of constitutional rights without regard to the amount in controversy. 28 U.S.C. § 1343(3) (1976 & Supp. 1979). *Hague* v. *CIO*, 307 U.S. 496, 513 (1939). Our jurisdiction is certainly not limited by the small amount of money in controversy here, and there is ample precedent for judicial action where the amount is small but the principle is not. Cf. *Fuentes* v. *Shevin*, 407 U.S. 67, 70 (1972) (summary process for debt of $200 denied due process of law); *Sniadach* v. *Family Fin. Corp.*, 395 U.S. 337, 338 (1969) ($31.59 in wages held adversely to garnishee deprived her of due process).

ization will receive the money it is entitled to and substantially reduces the interference with the organization's functions. *Id.* at 120. It also minimizes the impact on the constitutional rights of the dissenting employee by preventing any compulsory subsidization of objectionable activities. Therefore, dissenting employees may constitutionally be required to pay the disputed fee into a neutral escrow account pending adjudication under § 12. See *Abood, supra* at 244 (Stevens, J., concurring).

We conclude that § 12 does not require dissenting employees to pay the disputed fee to the association, pending adjudication. We construe § 12 to give the dissenting employee the option of bringing a prohibited practice complaint before the Labor Relations Commission if the employee wishes to challenge the fee amount. The commission may require the employee to pay the disputed fee into an escrow account, but may not require that it be paid to the organization until the commission has determined the permissible fee. Once the employee has brought a complaint, the burden of justifying the fee as permissible must rest on the organization. *Abood, supra* at 241. The commission should give prompt attention to such complaints in light of the competing interests of dissenting employees and associations of public sector employees. The necessity of protecting the rights of dissenters is not a justification for allowing an association to be "crippled by nonaccess to that portion of the fee which will be used for collective bargaining, contract administration and grievance adjustment." *White Cloud Educ. Ass'n* v. *White Cloud Bd. of Educ., supra* at 319.[9]

---

[9] We would expect the commission to adopt appropriate procedures, including one involving a prompt preliminary determination and payment of that portion of the fee clearly payable to the association, with the balance of the funds in escrow to be held by the commission pending resolution of the dispute. Since we conclude the proper allocation of such agency fees may be determined by the commission, we need not reach the issue of the reduction of future agency fees "by the same proportion" as may be determined in any given year. See *Abood, supra* at 240; *Ball,*

This case is remanded to the Superior Court for the entry of a declaration of rights in conformity with this opinion and for modification of the judge's order for deposit of the disputed agency fees by permitting transfer of said fees to the Labor Relations Commission for a determination of the amount which may properly be charged.

*So ordered.*

---

*supra* at 396. Nor is it necessary to consider, as did the *Ball* court, a requirement of "prospective" exhaustion of remedies by resort to internal union rebate procedures in regard to future disputes. See *Ball* at 396-397.