Josephson, J.
BACKGROUND
The plaintiff has brought suit against the defendants for (1) two instances of breach of contract, (2) collection of a negotiable instrument, and (3) violation of G.L.c. 93A sections 2 and 11. The defendants have counter claimed against the plaintiff for (1) assault and (2) assault and battery. The case was tried before a jury on all but the G.L.c. 93A claim. The jury found in favor of the plaintiff and against the defendant, Thomas Galgana, in the amount of $5,600.00 and $1,600.00 for each of the two breaches of contract, and in favor of the plaintiff and against the defendant, Thomas Galgana, in the amount of $600.00 for collection of a negotiable instrument. On the counterclaims, the jury found in favor of the plaintiff (defendant-in-the-counterclaim) and against the defendants (plaintiffs-in-the-counterclaims) on all claims. The G.L.c. 93A claim was tried at the same time before me. After trial, based on the credible evidence adduced and the reasonable inferences that can be drawn therefrom, I make the findings of fact that follow.
FINDINGS OF FACT
The plaintiff, Leo Bordeleau, is the owner of and does business as Phuture Productions (“Phuture”), an Agawam, Massachusetts audio illumination company that provides sound and lighting systems and equipment for commercial events, concerts and raves.[3] Bordeleau has successfully run Phuture since 1992. Phuture is certified as a d/b/a in Massachusetts. Bordeleau is an experienced sound and light provider who is known within the rave culture for his work.
The defendants, Charles Galgana (“Charles”) and his father Thomas Galgana (“Thomas”) are involved in producing raves, referring to themselves as doing business as “Keep on Smilin’.” Thomas, the owner of a plastics manufacturing company, provides capital and other support for the productions he and his son arrange. Charles lives at home with his father at 22 Gannett Road, Quincy, Massachusetts where the two operate their enterprise.
Some three months before the event at issue here, Bordeleau was hired by the defendants for an event they produced and ran at the Club Asylum (“Asylum”) in Springfield, Massachusetts. At that event Thomas collected tickets at the door with the owner of the club and paid Bordeleau the agreed price for his services at the end of the evening. In December 1999, Charles, acting for himself and his father, contacted Bordeleau and entered into an oral agreement with him for Phuture to provide sound equipment for a rave concert for Keep on Smilin’. The rave was to take place on January 29, 2000 in Plymouth, Massachusetts. Charles and his father worked together to secure the location, a 750,000-square foot commercial warehouse in an industrial park near Thomas’s business. Charles gave Bordeleau a tour of the building and led Bordeleau to believe that because of connections Thomas had, the building was secured as the location for the rave. Bordeleau agreed to provide the sound system necessaiy for the event which was promoted to draw approximately 15,000 attendees. Bordeleau discussed with Charles the requirements for a successful event. He indicated that he would install three sound systems and other equipment to accommodate the unusually large space. On December 28, 1999, Bordeleau emailed the defendants a $5,600.00 quote for the project. The defendants agreed to that price for Bordeleau’s services.
By January 2000, Charles and Thomas were heavily promoting the rave, distributing approximately 10,000 glossy, color brochures throughout the northeast of the United States and Canada advertising the event as “. . . the [ ] most expensive high tech, 17,651 capacity” venue. The brochure listed Phuture Productions as providing the lights and “main room turbosound.” In mid-January, Bordeleau received a copy of the brochure. In preparation for such a large venue and event, Bordeleau went to Plymouth on at least three occasions to view the building where the event was to occur. Pursuant to the agreement entered into between the defendants and Bordeleau, Bordeleau arranged for various additional sound equipment to be provided for the rave including some by Keith Trousdale of Trousdale Sound & Lighting (“Trousdale”) and Paul Brown (“Brown”) of Sound Principles, LTD. On January 15, 2000, Bordeleau paid Brown $2,000.00 for 36 Turboboxes to be provided for *542 the rave. On January 22, 2000, Bordeleau paid $1,200.00 to Trousdale for additional rental of a 25,000-watt Crown/Electro-Voice Sound Reinforcement System for the rave at Charles’ request.
By agreement, Brown and Bordeleau traveled to Plymouth to view the site in preparation for the event on two separate occasions. On the second trip to the venue, on January 21, 2000, Brown and Bordeleau met with Charles and a friend. During the visit, Charles emphasized that he had obtained all the proper permits and had an established relationship with the involved authorities, including the fire chief. During this trip, Brown and Bordeleau confirmed that 20,000 pounds of equipment would be erected within days of the event. Charles was aware that the equipment was set aside and unavailable for rental to any other customers. Bordeleau and Brown also met with Thomas whose business was a block away from the warehouse. Thomas introduced himself and said he was helping his son in this endeavor. At this point, Bordeleau was eager to receive the deposit that Charles had repeatedly promised to provide after he had entered into the agreement. Before this meeting, when the deposit had not been forthcoming, Bordeleau telephoned Charles five or six times requesting the agreed amount. At the meeting, Bordeleau asked again and finally received a $600.00 deposit from Thomas. The check was drawn on Thomas’s account. It was significantly less than the fifty per cent deposit that Bordeleau usually required and also less than the amount that Charles had agreed to pay.
After Thomas had issued the check to Bordeleau, Thomas said to Bordeleau and Brown, referring to the rave, “Let’s make some money.” At this point, the event was a few days from taking place and neither defendant gave any indication that the eventwas in jeopardy and may not occur. Instead, at Bordeleau’s urging they provided him with part of the deposit he had been seeking thereby confirming that the event would go forward and further assuring his continued involvement. This was a deception on the part of Charles and Thomas, as they were well aware as of January 18, 2000, that the building where the rave was to take place had been sold and would not be available on January 29,2000. Despite their representations to the contrary — including on the witness stand — neither Charles nor Thomas had ever undertaken the steps necessary to secure the location. That they had not done so is apparent from Charles’s and Thomas’s failure to enforce or attempt to enforce any agreement or to recover any amounts from the elusive “Japanese company” that Thomas testified had sold the building out from under them.
On January 18, 2000, Charles had begun a frantic search for a venue. When Charles and Thomas met with Bordeleau on January 21, 2000, they were still in the throes of attempting to secure a location, but led Bordeleau to believe that the Plymouth building he was shown had been leased and approved for the rave. By engaging in this deception, the defendants caused Bordeleau to expend an additional $1,200.00 the next day on securing equipment from Trousdale. This amount was in addition to the $2,000.00 they caused Bordeleau to expend on securing equipment from Brown less than a week before.
On January 22, 2000, after Bordeleau had incurred $3,200.00 in expenses for the sound equipment and one day after Bordeleau persuaded the defendants to pay a portion of the deposit, Charles informed Bordeleau that the Plymouth venue had fallen through and that the rave would be held at the much smaller Asylum location. This, too, ultimately proved to be untrue. This change meant a significant loss to Bordeleau as the venue was not only smaller, but also had its own sound system. Now with $3,200.00 expended on the event, Bordeleau tried to limit furthér losses by agreeing to provide the sound and lighting for the Asylum rave for $1,600.00. As the equipment rented from Brown was not necessary for the Asylum, Bordeleau tried unsuccessfully to negotiate a refund on the $2,000.00 he had paid.
On January 29, 2000, the day of the event, shortly before 10:00 am, Bordeleau began to receive a series of voice mail messages from Charles and Thomas. In the first Charles told Bordeleau that everything was going as planned. A little after noon, Charles called to say that the Asylum would require a $4,000.00 cash deposit and therefore Charles could not afford to pay Bordeleau the agreed $1,600.00. Later in the day, Charles called again and told Bordeleau that they could work something out and that Bordeleau could keep the $600.00 deposit. Sometime later in day, Thomas called Bordeleau and told him to forget about the sound system, “it’s a no go.” Finally, Thomas placed a last call to Bordeleau telling him again to “forget it . . . it’s not a doable deal.” When Bordeleau tried to cash the $600.00 check., he learned that Thomas stopped payment on it. Bordeleau received no money from the defendants.
The plaintiff brought suit in Springfield District Court seeking to recover on the same claims. The defendant, Thomas Galgana, countersued on the same grounds alleged in the instant complaint. On August 23, 2002, the Honorable Patricia T. Martinelli, Associate Justice of the District Court, found in favor of the plaintiff on his claims and against the defendants (1) in the amount of $6,600.00 on the breach of contract claim, (2) in the amount of $600.00 on the collection of a negotiable instrument claim, and (3) in the amount of $1,200.00 plus attorneys fees of $812.50 on the G.L.c. 93A claim. On the defendant’s counterclaim for assault, threats and assault and battery, the court found in favor of the plaintiff, Leo Bordeleau, and against the defendant, Thomas Galgana.
*543 DISCUSSION
G.L.c. 93A claim
In determining whether conduct violates G.L.c. 93A, Section 11, a court must consider “(1) whether the practice ... is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).” PMP Assoc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975), citing Federal Trade Commn. v. Sperry & Hutchinson Co., 405 U.S. 233, 244 (1972). Under Massachusetts Employers Insuarance Exchange v. Propac-Mass, Inc., 420 Mass. 39, 42-43 (1995), the crucial factors in determining the unfairness of a particular practice are the “nature of the challenged conduct and or the purpose and effect of that conduct. . .” Id. at 42-43.
A willful or knowing violation gives rise to multiple damages and occurs when one intentionally or knowingly acts to cause harm. Anthony’s Pier Four, Inc. v. HBC Assoc., 411 Mass. 451, 475 (1991). To establish a “willful or knowing” violation there must be some evidence that the defendant had a subjectively culpable state of mind. A finding of willful or knowing violation requires multiple damages. Bump v. Robbins, 24 Mass.App.Ct. 296 (1987); Computer Sys. Eng’g., Inc. v. QuantelCorp., 571 F.Sup. 1365 (D.Mass. 1983). A deliberate misrepresentation constitutes a willful and knowing violation. Brandt v. Olympic Constr., Inc., 16 Mass.App.Ct. 913 (1983).
There is no dispute that the plaintiff and the defendants were engaged in the conduct of trade or commerce at the time they entered into the agreements. I find, as the juiy did, (1) that Charles and Thomas Galgana entered into a contract with the plaintiff promising to pay him $5,600.00 for services in providing light and sound for a rave in Plymouth, Massachusetts, and (2) that Charles and Thomas Galgana breached the contract. The defendants engaged in unfair and deceptive practices in not only failing to inform the plaintiff when they knew that the venue was not available, but in deliberately deceiving the plaintiff by actively representing that the location and permits for the event had been secured while knowing full well that the representations were false. At the time of the initial agreement, the defendants attempted to shield themselves from losses and pass them on to Bordeleau by putting off paying the deposit that had been promised. During the time Charles was working with Bordeleau, he was aware that he had failed to take necessary steps to secure the venue, but led Bordeleau to believe he had. He allowed Bordeleau to expend time and money in setting up the rave without telling him that the location had not been secured. The main activity that the defendants undertook to further the event was simply to advertise it with Phuture listed as a participant as a means of attracting participants. By doing so while putting off Bordeleau’s requests for a deposit, they minimized their exposure and increased his.
Further, the defendants, Charles and Thomas Galgana, engaged in unfair and deceptive trade practices by providing a $600.00 check as a deposit for the purpose of inducing the plaintiffs continued involvement and then cancelling payment on the check. The defendants’ unfair and deceptive actions resulted in the plaintiff incurring an additional $1,200.00 in expenses in renting equipment and services for the event. The plaintiff performed his part of the contract to extent possible and was damaged in the amounts of $5,600.00 plus $1,200.00 by the breach by defendants, Charles and Thomas Galgana, for a total of $6,800.00 in damages. The defendants’ actions were willful and knowing acts in violation of G.L.c. 93A, sections 2 and 11. Accordingly, the plaintiff is entitled to multiple damages.
The defendants entered into a contract with the plaintiff promising to pay him an additional $ 1,600.00 to provide light and sound for a rave at the Asylum in Springfield, Massachusetts. I find, as the jury did; (1) that the defendants breached the contract, and (2) that the plaintiff suffered damages in the amount of $1,600.00. The defendants engaged in unfair and deceptive trade practices by first attempting on the day of the event to induce the plaintiff to provide the services agreed to at a lower price than agreed to and then telling the plaintiff the event was cancelled and his services not needed. The defendants further aggravated the injury to the plaintiff by assuring him that the $600.00 deposit was good only to then cancel payment on the check. These acts were willful and knowing acts in violation of G.L.c. 93A, sections 2 and 11.
Because of the deliberate, willful and egregious nature of the defendants’ deceptive acts, the plaintiff is entitled to double damages under the provisions of G.L.c. 93A. Accordingly, I find in favor of the plaintiff and against the defendants in the amount of $16,800.00 plus attorneys fees and costs.
Attorneys fees and costs
It is well established that the determination of reasonable attorneys fees is within a trial judge’s discretion. McGrath v. Mishara, 385 Mass. 74, 87 (1982). In determining reasonable attorneys fees, the court relies upon the affidavits submitted by the parties, as well as the Court’s knowledge of the case. Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 628-31 (1978).
The amount of reasonable attorneys fees is determined by conducting an analysis of several factors, including “the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation and ability of the attorney, the usual price *544 charged for similar services by other attorneys in the same area, and the amount of awards in similar cases.” Linthicum v. Archambault, 379 Mass. 381, 388-89 (1979). Recognizing that no one factor is determinative, and that a factor-by-factor analysis is not required, these findings are presented in summary. Margolies v. Hopkins, 401 Mass. 88, 93 (1987).
Considering the enumerated factors, I find that the billing rate of $150.00 per hour is an especially fair and more than reasonable rate based on the expertise and ability of the attorney and the nature of the matter at hand. Any reasonable attorney would have spent the time averred to in the plaintiffs submission in the preparation, research, attendance of hearings, tiying the case twice and other required activities in representing the plaintiff in the matter. Accordingly, I accept as reasonable the hours, fees and costs submitted by the plaintiff.
CONCLUSION
Thus, I determine that the bill submitted by the plaintiffs attorney represents a reasonable fee for the services required. For reasons previously stated, I award attorneys fees, costs and expenses in favor of the plaintiff and against the defendants in the amount of $7,781.02 (Seven Thousand Seven Hundred Eighty-One Dollars and Two Cents).
Accordingly, judgment shall enter in favor of the plaintiff, Leo Bordeleau, d/b/a Phuture Productions and against the defendants, Thomas Galgana and Charles Galgana, jointly and severally, in the amount of $16,800.00 (Sixteen Thousand Eight Hundred Dollars) plus reasonable attorneys fees, costs and expenses in the amount of $7,781.02 (Seven Thousand Seven Hundred Eighty-One Dollars and Two Cents).

A rave is a dance party that lasts all night at which electronically synthesized music is played. It is a one-time event generally held at a warehouse or other type of large capacity building. Sound and light equipment is installed for the event to provide techno music and light shows. Raves attract unusually large groups of young partygoers. These events are advertised through brochures distributed throughout a region, in this case the Northeast United States and into Canada.